19 N.J. Super. 546 (1952)
89 A.2d 61
NETTIE CLAYTON AND BERT CLAYTON, PLAINTIFFS-RESPONDENTS,
v.
JERSEY CENTRAL POWER AND LIGHT COMPANY, A BODY CORPORATE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 5, 1952.
Decided May 21, 1952.
*547 Before Judges EASTWOOD, BIGELOW and FRANCIS.
*548 Mr. Theodore J. Labrecque argued the cause for the plaintiffs-respondents (Messrs. Parsons, Labrecque, Canzona & Combs, attorneys).
Mr. Harry Green argued the cause for the defendant-appellant (Mr. Vincent P. Keuper, attorney).
The opinion of the court was delivered by FRANCIS, J.C.C.
Trial of this action resulted in jury verdicts of $25,000 in favor of the plaintiff, Nettie Clayton, for her personal injuries, and $5,000 for Bert Clayton, her husband, to cover his derivative losses. Defendant applied to the trial court for a new trial, contending that the verdicts were contrary to the weight of the evidence. The application was denied and this appeal is now prosecuted. Here the grounds urged for reversal are that no negligence was proved against the defendant, that the injuries suffered by Mrs. Clayton were not the natural and proximate result of the act of defendant's agent, that the verdicts were contrary to the weight of the evidence and that the trial court erroneously allowed certain questions to be answered.
Our study of the record has led to the conclusion that evidence was adduced at the trial from which the jury might legitimately and naturally find the following facts: The plaintiffs resided in a single floor bungalow in Neptune Township, New Jersey, and obtained their gas and electric service from the defendant. On September 14, 1949, the defendant, claiming that a gas and electricity bill was overdue and unpaid, sent its employee to their home with instructions to collect the bill or shut off the service. The collector, who had been there in July on a similar mission, arrived shortly after noon, rang the door-bell, and Mrs. Clayton appeared. After explaining his mission, she advised him that the bill had been paid and that she had the receipts in the dining room server.
This conversation took place at the front porch. The next room, proceeding from front to rear is the living room, then the dining room, and last the kitchen, where the defendant's *549 meter and control switch were located. Between the living and dining rooms is an open archway; opposite the archway, on the other side of the dining room and slightly to the left, is the kitchen door. A person standing in the living room and looking toward the rear of the house would have a clear view into the dining room and kitchen, and in walking from the living room to the kitchen he would pass very near the server referred to.
The collector followed Mrs. Clayton into the house and she obtained some receipts from the server. They were handed to him. After some discussion he threw them to the floor and said he was going to shut off the electricity as he had orders to do. She was between him and the kitchen and he undertook to pass by her to get there. In doing so he either negligently pushed or knocked or brushed her out of his path, with the result that she was thrown to the dining room floor and lost consciousness. On coming to she was on the floor, alone in the house, and apparently unable to rise. A telephone was on a desk next to the server; she took hold of the wire, pulled it to the floor, and telephoned her son.
Such a finding is supported not only by the substance of the injured plaintiff's testimony, but by the corroborative statements of other witnesses. The son, who was telephoned, came home immediately and found his mother on the dining room floor with the telephone beside her. He picked her up and put her on a couch in the living room where she remained until a physician came to see her.
Phyllis Gant, a granddaughter-in-law, and a Sara Miller (whose name was Sadler at the time of trial because of a remarriage), Mrs. Gant's stepmother, were in the Clayton home when defendant's representative arrived to collect the bill. Mrs. Sadler testified for the defendant and adversely to the plaintiffs on some important aspects of the case and her credibility was attacked sharply in an effort to show animosity and ill feeling toward the Claytons. In any event, both Mrs. Gant and Mrs. Sadler testified that Mrs. Clayton obtained some bills and handed them to the collector. According *550 to Mrs. Sadler there was some further discussion and he was asked to look them over. He said it was no concern of his and that he wasn't going to do it. "At the same time" he put his hand on her shoulder as "she was going to hand him the bills" * * * "and the bills did go to the floor." Mrs. Gant said the collector was using a "loud voice" and was not "talking very nice"; she did not know "whether he threw them or whether he just slung them or what he did but anyway they landed on the floor." When this occurred Mrs. Clayton, who was very excited and nervous, asked Mrs. Sadler to take Mrs. Gant in her car and get Mr. Clayton who was working a short distance from home. At this request they set out to do so.
The principal witness for the defense was the collector and his statements were in direct contradiction of the injured plaintiff. He denied ever striking her, pushing her aside, or knocking her down as he attempted to enter the kitchen. He said she told him her husband probably had the receipts with him, whereupon he left, saying that he would stop back later after she had communicated with her husband by phone. However, his testimony in important details might well have led the jury to be skeptical of his credibility. He didn't remember whether there were any other persons in the house while he was there; he didn't think he said anything about disconnecting the service if the bill was not paid. He conceded she went to look for receipted bills but he did not remember that she produced any; "she might have had some"; he wouldn't deny that bills were on the floor; he didn't remember putting a hand on her shoulder or touching her; "I didn't put my hands on her in any way that would cause her to fall or anything to hurt her in any way, and if I did, it was in the matter of conversation, which I doubt"; but he would not deny that he put his hands on her.
The irreconcilable conflict in the testimony on the whole case created a typical jury problem and the trial court properly submitted it to the jury for determination. In reviewing their verdict we must give due regard to their *551 opportunity and that of the trial court to pass upon the credibility of the witnesses. Rules 1:2-20; 3:59-1. In appraising the result our judgment cannot be substituted for that of the jury; the condition precedent to judicial interference is a finding that "it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion." Rules 1:2-20; 3:59-1. Such a finding cannot be made on the liability aspect of the case.
It is not argued that the verdicts were excessive. Appellant's position is that the trial court erred in denying the motion at the close of the case for judgment in its favor on the ground that plaintiff had failed to prove that the physical incident of which she complained was the proximate cause of her injuries; and further, that the finding of the jury of causal relation between the incident and her injuries was contrary to the weight of the evidence.
The claim of the injured plaintiff was that as a proximate result of the conduct of defendant's employee she suffered a brain hemorrhage which produced a left side hemiplegia; also, because the paralysis required long confinement to bed a serious and troublesome kidney ailment came into being.
The evidence disclosed that at the time of this incident Mrs. Clayton was 60 years of age and weighed about 200 pounds. Her husband, grandson and his wife, and two great-grandchildren lived with her in a seven-room bungalow. She kept house for them all.
Prior to September 14, 1949, she suffered from a condition called paroxysmal tachycardia, a functional and not organic condition of the heart, characterized by rapid beating and a feeling of difficulty in breathing. She also had arteriosclerosis or hardening of the arteries, a progressive disease, which as of September, 1949, was described by her family physician as from moderate to severe in form but for which she had received no medical treatment. This physician also said that her blood pressure was normal for a person of her age and that she had never suffered a cerebral hemorrhage at any time.
*552 Dr. Seymour S. Estrin, the family physician, came to the Clayton home on the afternoon of the affair with defendant's agent. He found her on the couch where the son had placed her. At this time she was agitated, hysterical, confused and argumentative; she complained of a severe headache and her eye pupils were constricted; her face was flushed and she had some slurring of her speech; her blood pressure was 190. Examination showed some weakness in the left upper and lower extremities and some neurological tests were positive. The doctor concluded that she had suffered a small hemorrhage of the brain. He continued to treat her and observed that her condition mentally and physically was getting progressively worse; particularly the weakness in the left arm and leg increased. On September 30 examination revealed a complete paralysis of the left arm and leg, and the fingers of the left hand had taken on a claw-like appearance. This paralysis was caused by the rupture of a blood vessel in the brain and is a permanent condition. Except for a few trips in ambulances and occasional use of a wheel chair she has been and will probably continue to be bedridden.
Dr. Estrin asserted that the paralysis is directly attributable to the incident of September 14, 1949. The explanation offered was that to have the brain hemorrhage which produced the condition, two elements had to be present, first, arteriosclerosis in the cerebral arteries, and secondly, a sudden rise in blood pressure to a point where the hardened and inelastic arteries cannot withstand the increase and consequently rupture. The resulting hemorrhage in the brain may be slight or massive, depending on the nature of the rupture. In this instance the original hemorrhage was slight, as indicated by the slurring of the speech and the weakness in the left arm and leg. Then a progressive, degenerative process set up in the brain which ultimately resulted in the massive hemorrhage and paralysis during the night of September 29 or on September 30.
*553 In relating the two postulates to this case he said Mrs. Clayton had hardening of the arteries prior to September 14, 1949. Then, under the emotional stimulus of the verbal altercation and the physical contact with the defendant's collector, her blood pressure rose suddenly to the point where the diseased cerebral artery could not withstand the advance and the rupture and immediate hemorrhage ensued. The deterioration thus set up in the brain then progressed to the ultimate severe hemorrhage and paralysis.
In January, 1950, a specialist in urology was called to attend the injured woman. He found her to be suffering from a kidney condition known as pyelonephritis. This is an infection which came into being because she had been bedridden so long and poor drainage from her kidneys had developed. So long as she continues to be bedridden, in his judgment no cure can be effected.
The medical defense centered around this thesis: The paralysis cannot be charged to the altercation because if there had been a rupture of a cerebral artery on the right side so as to produce hemorrhage, the paralysis would have been immediate. Since the paralysis did not occur until September 29 or 30 the hemorrhage must have occurred then.
All three of the defense doctors who testified on this subject agreed that a sudden rise in the blood pressure of a person suffering with arteriosclerosis might produce a cerebral hemorrhage. The only specialist in diseases of the blood vessels admitted also that in the vast majority of cases "anything that produces excitement will tend to elevate the pressure." Likewise this specialist said that a brain hemorrhage is associated with some loss of motor function from weakness to paralysis; sometimes with some loss of speech, and it may cause a slurring of speech.
One non-specialist said he did not know what the leg and arm weakness could be attributed to; with the slurring of speech it perhaps meant hysteria. And the other said both the weakness of the extremities and the speech slurring were an "anxiety reaction."
*554 Sufficient references to the medical proof have been made to demonstrate that the causal relation between Mrs. Clayton's paralysis and the altercation was the subject of divergent medical opinion. Determination of that problem was properly for the jury and we see no justification under the rules for setting aside their findings.
Defendant argues that since plaintiffs' principal medical witness at one point in his testimony said that the "physical injury had nothing to do with the stroke," and that it was "the emotional conflict which caused the elevated blood pressure," the claim must be considered solely as one involving physical injuries resulting from mental anguish or nervous or emotional shock and therefore not compensable. Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90 (Sup. Ct. 1936); Oehler v. L. Bamberger & Co., 4 N.J. Misc. R. 1003 (Sup. Ct. 1926); Ward v. West Jersey & Seashore Railroad Co., 65 N.J.L. 383 (Sup. Ct. 1900); Annotation, 122 A.L.R. 1486; 56 A.L.R. 657; 44 A.L.R. 428. The record is not at all clear as to whether "physical injury" meant the result of plaintiff's being pushed or knocked aside by the collector or of her contact with the floor when she fell. Moreover, at another place in his examination the doctor said that the "pushing or shoving" or the contact with the floor had a "direct relation" with the rise in blood pressure. In any event, it is fairly inferable from a full analysis of all of his testimony, and thus open to the jury to make such a finding, that what he meant was that the physical injury as such did not produce the change in blood pressure; the change and the resultant brain hemorrhage were produced by the emotional upset and conflict set up by the altercation and the various physical contacts. The case, therefore, is not controlled by the doctrine which excludes liability for injuries occasioned by fright or shock alone. The physical contacts distinguish it therefrom. Porter v. Delaware, Lackawanna & Western Railroad Co., 73 N.J.L. 405 (Sup. Ct. 1906); Consolidated Traction Co. v. Lambertson, 59 N.J.L. 297 (Sup. Ct. 1896).
*555 Finally it is contended that the trial court erred in permitting a medical witness for plaintiffs to answer the following two questions:
"Will you tell us what it (the history) was?"
"What was the history you obtained from her?"
The witness being examined was a treating physician. History given by a patient to such a doctor of her physical condition, symptoms and complaints is admissible. "While such declarations partake of the nature of hearsay, they derive some credibility beyond that of hearsay, from the fact that the patient expects his physician or surgeon to be guided by them in administering remedies, and so the patient has an incentive beyond the ordinary obligation to tell the truth." State v. Gruich, 96 N.J.L. 202 (E. & A. 1921). However, the rule does not extend to statements of the patient as to the cause of the injury or condition. (Id. p. 204). Consequently a question as to the history obtained from the patient is a proper one and when it is put, counsel representing the adverse party has two courses open to him. He may ask the court to instruct the doctor to give only the patient's declarations as to his condition, symptoms, sensations, feelings and complaints, and not any of his statements as to the cause thereof. Or he may await the answer and if the doctor includes the patient's declarations as to the cause of his condition, he may move to strike the inadmissible part from the record. Here neither course was adopted. Moreover, there was no proper objection to the first of the two questions stated, and no objection at all to the second. The first of the two questions inquired as to the history given. Counsel then requested that the date be given when the history was taken and upon the witness's answer that he could not give the exact date, an objection was advanced on the ground that it was "too uncertain." Some colloquy followed between the court and counsel and then the second question criticized was put and fully answered without objection or motion to strike. This state of the record necessarily *556 leads to the conclusion that the question as to history was a proper one, that in any event no legally sustainable objection was made (Raab v. American Casualty Co., 4 N.J. 303 (1950); Rule 3:46), and that the answer as given was not made the subject of any ruling by the court.
The record indicates also that another medical witness was permitted to give the same history without objection; and during the course of examination, without objection or motion to strike, two lay witnesses gave substantially the same history which they had obtained from the plaintiff. Under all of the circumstances no cause for reversal is presented. Rule 1:2-20(b).
We find no merit in any of the grounds urged and consequently the judgment below is affirmed.