252 N.J. Super. 84 (1991)
599 A.2d 528
RIKI DINTER AND ELLIOTT DINTER, PLAINTIFFS-APPELLANTS,
v.
SEARS, ROEBUCK & COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1991.
Decided November 14, 1991.
*87 Before Judges PETRELLA, ASHBEY and ARNOLD M. STEIN.
Marc J. Friedman argued the cause for appellants (Rich & Friedman, attorneys; Marc J. Friedman, of counsel and on the brief).
Frank P. Addas argued the cause for respondent (Addas & Potenza, attorneys; Frank P. Addas, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiffs Riki Dinter and Elliott Dinter appeal from the entry of a judgment dismissing their complaint after a jury verdict of no cause of action.[1] Plaintiffs' post-trial motion to set aside the jury verdict or for a new trial was denied.
The jury trial consumed 22 days in April and May 1990. The underlying incident occurred on February 17, 1987, when Dinter went to the Sears, Roebuck & Co. (Sears) parts supply facility on Route 17 in Maywood shortly after 9:30 a.m. to pick up parts for her dishwasher in a car she borrowed from a neighbor. Upon driving into the parking lot, Dinter "felt" bumps as she parked the car. Dinter testified she was wearing flat boots with rubber soles and that the sequence of events thereafter was as follows:
I opened the door. Before I turn around  when I turn around, when I put my feet outside, I looked around me. I didn't understand what this bump was.

*88 When I was looking around, I saw ice around the car. Then I got up. I looked again around me to find a safe place to walk. When I was looking down, I find this puddle of water. I thought it's puddle of water. It was early in the morning. The sun was hitting the area. I gave a few steps and I decide I was any way with boots, it will be safe for me to walk on water instead of ice. The time that I put my feet on this puddle of water that turn out to be ice, I slipped. That's my first slip.
On cross-examination, Dinter said that she noticed snow and ice on the ground "automatically" before she stepped out of the car with her left foot. She then took a few steps before she closed the door. When she stepped into the "puddle" with her left foot, her "foot went up in the air," and she landed on her back and the back of her head.
Dinter was uncertain how long she remained on the ground or whether she lost consciousness. She said she screamed for help, but no one heard her, and finally crawled around the car to the ramp leading to the entrance of the store and got to her feet with the help of the door. Dinter said on cross-examination that prior to this incident she suffered from fainting and dizzy spells.
Dinter related what happened to the cashier, Ruth Bross. She further testified that her coat was soaking wet and dirty, her hair was wet and bloody, and she was slumped over in pain. However, Bross did not recall anything out of the ordinary about Dinter's appearance. According to Dinter, the cashier told her to take a number and give her complaint to the guy who serves her. When her number was called, Dinter informed the employee, Richard Blog, that she fell and was in a great deal of pain. Blog interrupted her, asking what he could do for her. He repeated his inquiry and Dinter gave him her order for dishwasher racks and tray. Blog promised that "they will take care of it. They will clean it." He then asked another employee, John Cincotta, to help Dinter carry the parts to the car. Blog did not notice anything out of the ordinary as he observed Dinter exit the store.
Dinter said that Cincotta carried her boxes to the car and then returned, took her arm and escorted her to the car. *89 Cincotta denied this and testified that Dinter walked down the ramp and to the car without his assistance. He did not observe anything out of the ordinary about her walk as he carried the parts to her car. He also testified that he did not notice any ice or snow in the area of her car. However, Cincotta's statement to his employer, not furnished to plaintiff's attorney for cross-examination,[2] regarding the customer that fell on Tuesday, February 17, 1987, stated: "[c]arried parts to her car for her dishwasher. There was ice around her car, and she said it was slippery and somebody should do something about it. I agreed."
Dinter said she rested in the car for a few minutes then drove home. She parked the car in her driveway and stepped out. Dinter called her neighbor's son to help her with the boxes and to pick up the car which belonged to the boy's parents. As Dinter entered her house, her friend telephoned and she told her what had happened.
Dinter said she then crawled upstairs to take a hot bath, and thereafter laid down on the bed with a heating pad. She also said she later called her physician, Dr. Fioretti, who had previously treated her for various conditions, including a fractured pelvis in an automobile accident, a sacroiliac sprain; tenderness in the left lumbosacral area, and injuries from a series of fall down accidents. Dinter made an appointment for the following day. Later that afternoon, Dinter called Sears to ask if she had to fill out an accident report. When she informed the employee of the accident and that she had a doctor's appointment the next day, the employee asked Dinter to return to the store and file a report before her appointment.
*90 Dinter returned to Sears to fill out the accident report on February 19, 1987.[3] She went to Dr. Fioretti's office that day. He described her injuries as multiple bruises of her back, sprain of the lumbosacral area and a bruise over the occipital area of the head. He prescribed an anti-inflammatory agent, pain medication, and whirlpool therapy.
Despite therapy, Dinter continued to experience back pain radiating down her left leg. Dr. Fioretti ordered a CAT scan of her lumbar spine which revealed a disk displacement. He referred Dinter to Dr. Megibow, an orthopedic surgeon. Prior to Dinter's fall in February 1987, Dr. Fioretti had prescribed anti-vertigo medication for her, and had referred her to a neurologist for a severe vertigo condition in October 1986. Dinter's 1986 complaints were loss of balance, dizziness, and intermittent episodes when her left leg would give way. However, Dinter testified that on the day of the accident in the Sears lot in February 1987 she was not dizzy and slipped on the ice.
There was extensive testimony about Dinter's injuries and condition. Due to depression and mounting feelings of suicide which assertedly resulted from constant pain, Dinter was referred to a psychiatrist. The psychiatrist said that Dinter was severely depressed. A neighbor of Dinter testified as to Dinter's ability to drive a car and carry bags of groceries while supposedly disabled from the fall at Sears.
There was also testimony regarding Dinter's prior medical problems and about Dinter's subsequent move to Oklahoma, and later Florida.
Apparently primarily on credibility grounds, the jury rejected plaintiffs' allegations that Sears was negligent. In denying *91 plaintiffs' post-trial motion, the judge concluded that the verdict was not contrary to the weight of the evidence and stated:
[I]n order to overturn the verdict of the jury I would have to find that in weighing the testimony and the credibility of the witnesses, the opportunity of the jury to pass thereon, that it clearly and convincingly appears that there was a miscarriage of justice, and whatever adjectives you use, miscarriage of justice, manifest denial of justice, which was the old standard, shocking to the conscience, I could not find that the jury verdict form that, jury verdict was a miscarriage of justice under the law.
* * * * * * * *
But looking at the totality of the testimony in this case the jury could easily conclude, and I use that term understanding the significance of this case and the magnitude of this case, could easily conclude that the testimony of the plaintiff or the plaintiff's witnesses was just not believable with respect to the manner in which this fall occurred.
On appeal, the Dinters argue: (1) the cause of the accident should not have been deleted from medical records or precluded from the testimony of experts; (2) the trial judge should have allowed Elliott Dinter to testify about his conversation with his wife after the accident; (3) the judge should have directed discovery of defense witnesses' written statements; and (4) Dinter should have been permitted to testify about the condition of the parking lot two days after the accident.

I.
Plaintiffs argue that in precluding Dinter's statements to physicians the judge failed to consider whether her description of the cause of her fall was relevant to diagnosis or treatment, thus making it an exception to the hearsay rule. See Evid.R. 63(12).
Sears argues that Dinter's statements to her treating physicians regarding the cause of the accident are not innately trustworthy because they were not made for purposes of diagnosis and treatment. It also argues that various witnesses testified to the icy condition causing the fall, and hence, the jury heard fully about her version of her fall. Thus, it argues there was no negative presumption that the fall occurred because *92 of Dinter's instability due to her previous medical problems and condition which were unrelated to this incident.
As a general rule, admission or exclusion of proffered evidence is within the discretion of the trial judge whose ruling is not disturbed unless there is a clear abuse of discretion. State v. Wise, 19 N.J. 59, 98, 115 A.2d 62 (1955); Purdy v. Nationwide Mutual Insurance Co., 184 N.J. Super. 123, 130, 445 A.2d 424 (App.Div. 1982); Schweizer v. Mac Phee, 130 N.J. Super. 123, 127, 325 A.2d 828 (App.Div. 1974). Even where there may have been error, reversal is required only when an unjust result occurred. Purdy v. Nationwide Mutual Insurance Co., supra (184 N.J. Super. at 130, 445 A.2d 424).
Under Evid.R. 63(12) a good faith statement by a patient to a physician for the purpose of diagnosis and treatment is admissible in evidence. Bober v. Independent Plating Corp., 28 N.J. 160, 170, 145 A.2d 463 (1958); Clayton v. Jersey Central Power & Light Co., 19 N.J. Super. 546, 555, 89 A.2d 61 (App.Div. 1952), certif. denied, 10 N.J. 314, 91 A.2d 230 (1952). However, statements as to the cause of the injury are not automatically within the hearsay exception in Evid.R. 63(12). This is so because a patient's desire to be helpful to the physician in treatment and administering remedies is not necessarily present. See Clayton, supra (19 N.J. Super. at 555, 89 A.2d 61). See also Bober, supra (28 N.J. at 170, 145 A.2d 463).
In the case before us, there was no testimony by any physicians who testified on Dinter's behalf that the cause of her fall was relevant to diagnosis or treatment. Absent such evidence, the requirements of Evid.R. 63(12)(c) were not met. See Rose v. Port of New York Authority, 61 N.J. 129, 138, 293 A.2d 371 (1972); Barrie v. Central Railroad Co. of New Jersey, 71 N.J. Super. 587, 595-596, 177 A.2d 568 (App.Div. 1962), certif. denied 37 N.J. 87, 179 A.2d 416 (1962). Moreover, even though such statements concerning her "fall on ice" were not allowed, there were repeated references to icy conditions on the property throughout the trial by various witnesses. Although such *93 statements might be allowable under a discretionary ruling, there was no prejudice to plaintiffs and no reversible error on that ground. Vohta v. Bogue Electric Manufacturing Co., 60 N.J. Super. 169, 172, 158 A.2d 536 (App.Div. 1960), certif. denied 32 N.J. 353, 160 A.2d 849 (1960).

II.
The next issue involves exclusion of testimony by Elliott Dinter about a telephone conversation with his wife in which he first learned of her injuries. This conversation occurred at an undisclosed time on the day of her fall. Dinter contends that the jury was precluded from knowing her version of the facts "immediately after the accident" as she relayed them to her husband.
A statement is admissible under Evid.R. 63(4) if made in reasonable proximity to the event and the declarant did not have an opportunity to deliberate or fabricate. The statement must be an excited or spontaneous utterance. See Fagan v. City of Newark, 78 N.J. Super. 294, 303, 188 A.2d 427 (App.Div. 1963). Factors to be considered on a proffer of such a statement include: (1) the elapsed time between the event and the statement; (2) the circumstances; (3) the declarant's mental and physical condition; (4) the shock or excitement produced; (5) the nature of the statement (whether against the interest of the declarant, or whether made in response to questions or involuntary); and (6) any other material facts. Lieberman v. Saley, 94 N.J. Super. 156, 161, 227 A.2d 339 (App.Div. 1967).
During the direct examination of Elliott Dinter, plaintiffs' then attorney[4] requested a side-bar conference in anticipation of defendant's objection to the conversation sought to be elicited. At side-bar there was reference to extensive questioning in deposition. Defendant's attorney objected to testimony *94 regarding the conversation on hearsay grounds. The judge sustained the objection and the side-bar concluded. Plaintiff's attorney then abandoned this line of questioning, thus failing to make a proffer or lay the necessary foundation to establish an excited utterance exception. As such, the judge was not given the opportunity to rule on the admissibility of the conversation under Evid.R. 63(4). There was no attempt by plaintiffs' attorney to establish the criteria referred to in Lieberman. As a result, it is unclear from the record whether the telephone conversation between the Dinters occurred before or after she telephoned her physician and Sears. Indeed, other events occurred, including Dinter having the opportunity to take a bath and rest. These facts dilute the likelihood of a continuing state of excitement. See State v. Williams, 106 N.J. Super. 170, 172, 254 A.2d 538 (App.Div. 1969), certif. denied 55 N.J. 78, 259 A.2d 228 (1969), cert. denied 397 U.S. 1057, 90 S.Ct. 1405, 25 L.Ed.2d 675 (1970); State v. Walker, 199 N.J. Super. 354, 362, 489 A.2d 728 (Law Div. 1985). Hence, that ruling does not support a claim for reversal.

III.
We turn next to plaintiffs' argument that the judge erred in precluding testimony concerning ice in the Sears parking lot two days after the accident. Dinter maintains that such information is relevant to support an inference that there was ice on the day of the accident.
This evidence may be relevant if it can be established that the weather conditions were substantially the same at the same time on the particular date of the fall with no intervening thaws. However, the jury's concern was actually focused on the condition of the parking lot at the date and time of the accident. Although plaintiffs might have been seeking to establish that the condition of the parking lot two days after the accident was substantially the same as it was at the time of the fall, there had to be a showing that no changes were made. Ice *95 and snow being transient, particularly so in more recent winters in this area of the nation, and the judge's determination being one of discretion, we find no basis for reversal on that ground. Despite some arguable relevance of the condition of the property two days later, the judge's ruling under Evid.R. 4 cannot be said to have been arbitrary or an abuse of discretion.

IV.
Finally, we turn to plaintiffs' contention that they were entitled to the statements of certain employees of Sears given prior to trial. Plaintiffs' trial attorney had requested copies of all statements of all defense witnesses. He repeated that request on various occasions, including far too numerous side-bar discussions. Instead of waiting for cross-examination to request a copy of a statement, plaintiffs' attorney frequently interrupted the direct examination of a defense witness to request a side-bar conference to ask if there was a statement and for a copy. This procedure is hardly conducive to a proper presentation of the trial and must have been disruptive to the jury which was frequently excused.
Plaintiffs ascertained during the trial that Sears employees, Richard Blog, John Cincotta and Ruth Bross (who had each been identified in discovery and testified) had prepared handwritten statements immediately following the accident which were later put in typed form by a claims investigator or adjuster for Allstate Insurance Company. The trial judge did conduct an in camera review of defendant's insurer's file here and concluded that the pertinent documents, other than the three employee statements contained therein, had all been furnished in discovery. The names of the Sears employees who had spoken to plaintiff on the day of her alleged fall had been furnished and Sears had identified these individuals as persons with relevant knowledge in its answers to interrogatories. The judge ruled that the statements were work product of the defendant's attorney. At our request, copies of these statements *96 were furnished to us for review and to plaintiffs' appellate attorney for the sole purpose of this appeal.
Plaintiffs contend that these statements were obtained by Sears in the normal course of its business, not necessarily for litigation purposes, and were discoverable prior to trial. Alternatively, they argue that even if privileged, they should have been turned over once the witnesses were called to testify.
Sears contends that the statements were taken in preparation for litigation and under the direction of counsel, and are thus protected by the attorney-client privilege. See Evid.R. 26(3)(a). The record does not support this contention. The testimony of the investigator contradicts the assertion that the statements (prepared before she became involved) were written at the direction of counsel or in preparation for litigation.
Sears contends additionally that plaintiffs had been given the names of these witnesses in answers to interrogatories, but failed to seek further discovery. Moreover, Sears argues that plaintiffs failed to present a waiver argument to the trial court, and thus should be barred from raising it now.
Merely because statements are taken from witnesses who are employees of a defendant does not necessarily make them privileged. No party has proprietary rights to any witness. Indeed, absent a privilege, no party can properly restrict access to any witness. Stempler v. Speidell, 100 N.J. 368, 381, 495 A.2d 857 (1985); Kurdek v. West Orange Bd. of Educ., 222 N.J. Super. 218, 226, 536 A.2d 332 (Law Div. 1987). Cf. State v. Ciba-Geigy Corp., 247 N.J. Super. 314, 589 A.2d 180 (App.Div. 1991); State v. Roszkowski, 129 N.J. Super. 315, 318, 323 A.2d 531 (App.Div. 1974), certif. denied 66 N.J. 325, 331 A.2d 25 (1974).
We have reviewed each of the statements. They are all extremely brief, only a few lines each, and entirely factual. In our view, no valid reason appears as to why these documents could not have been provided, at least when requested by *97 plaintiffs' attorney, for the limited purpose of cross-examination.
It is true plaintiffs knew of the existence of the witnesses and could have taken their depositions.[5] They did not. Likewise, supplemental interrogatories were not served and there was no motion for more specific answers to the interrogatories. On the one hand, plaintiffs have the duty to use the discovery procedures available before complaining that the other party has not revealed relevant information. Buccafusco v. P.S.E. & G., 49 N.J. Super. 385, 392, 140 A.2d 79 (App.Div. 1958), certif. denied 27 N.J. 74, 141 A.2d 318 (1958). On the other hand, there is a continuing duty on the part of the attorneys to amend answers to interrogatories. R. 4:17-7; see Clark v. Fog Contracting Co., 125 N.J. Super. 159, 161-162, 309 A.2d 617 (App.Div. 1973), certif. denied 64 N.J. 319, 315 A.2d 408 (1973); Falcone v. N.J. Bell Telephone Co., 98 N.J. Super. 138, 145, 236 A.2d 394 (App.Div. 1967), certif. denied 51 N.J. 190, 238 A.2d 475 (1968). We are aware, however, that in practice, compliance with the Rules of Court, and particularly discovery items is quite lax. Unfortunately, that now appears to be the norm rather than the exception.
The attorney-client privilege is based on a premise of "preserving the sanctity of confidentiality of a client's disclosures to his attorney [to promote] an open atmosphere of trust." Reardon v. Marlayne, 83 N.J. 460, 470, 416 A.2d 852 (1980). This principle has been applied to photographs and statements of witnesses and key personnel taken at the direction of corporation counsel. See Macey v. Rollins Environmental Services, 179 N.J. Super. 535, 539-540, 432 A.2d 960 (App.Div. 1981). However, actual statements of eyewitnesses or persons involved in connection with an incident, to the extent *98 that they are entirely factual as opposed to comments and investigation do not rise to the same level. See Appleman, 20B Insurance Law and Practice, § 12082 (1980 ed.); cf. State v. Ortega, 198 N.J. Super. 161, 486 A.2d 904 (App.Div. 1985).
Thus, in State v. Pavin, 202 N.J. Super. 255, 262, 494 A.2d 834 (App.Div. 1985), we declined to apply the attorney-client privilege to an interview and statement given by the defendant to an insurance adjuster and said:
[N]o blanket privilege with respect to communications between an insured and his adjuster should be countenanced. Rather the privilege should be held to shield communications between the insured and the adjuster only where the communications were in fact made to the adjuster for the dominant purpose of the defense of the insured by the attorney and where confidentiality was the reasonable expectation of the insured. [Id. at 262, 494 A.2d 834].
We reasoned in Pavin that a statement taken ten days after the accident, before any litigation began or any claim was filed, was clearly outside the scope of the privilege. Id. at 263, 494 A.2d 834. As in Pavin, there is no indication that the statements were taken at the request of an attorney. See also Torraco v. Torraco, 236 N.J. Super. 500, 502-503, 566 A.2d 240 (Ch.Div. 1989) (adverse party in matrimonial action entitled to inspection of documents "long in existence," but recently obtained by investigator, and not considered work product, although not entitled to depose investigator who was an agent of attorney who hired him, and thus under mantle of attorney-client and work product privileges).
In order to obtain the work product of an adverse party, the party seeking information must establish that he has a substantial need for it and that it cannot be obtained without undue hardship from another source. See Jenkins v. Rainner, 69 N.J. 50, 57-58, 350 A.2d 473 (1976); Wagi v. Silver Ridge Park West, 243 N.J. Super. 547, 580 A.2d 1093 (Law Div. 1989).
Since the record does not reflect that the statements were actually taken by an insurance investigator or under the direction *99 of an attorney,[6] a question arises as to whether these statements should even be considered privileged or qualified privilege work product. See, e.g., Bough v. Lee, 28 F. Supp. 673, 674 (S.D.N.Y. 1939); Kulich v. Murray, 28 F. Supp. 675, 676 (S.D.N.Y. 1939); Iwamoto v. Hirata, 49 Hawaii 514, 422 P.2d 99, 100 (1966); Rigelman v. Gilligan, 265 Or. 109, 506 P.2d 710, 713 (1973); Jacques v. Cassidy, 28 Conn.Sup. 212, 257 A.2d 29, 37 (Conn.Super.Ct. 1969); Brandywine Shoppe, Inc. v. State Farm Fire & Cas. Co., 307 A.2d 806, 811 (Del. Super. Ct. 1973). See also Fireman's Fund Ins. Co. v. McAlpine, 120 R.I. 744, 391 A.2d 84 (1978) (qualified privilege for statement taken in anticipation of litigation). Contra., Koch v. Mettler, 49 Ill. App.2d 251, 199 N.E.2d 417, 419-420 (1964); Ragona v. Alexander's Rent-A-Car, Inc., 36 A.D.2d 971, 321 N.Y.S.2d 640 (2nd Dept. 1971). According to Professor Appleman's treatise, the dominant rule, at present, is that "statements of any witness, including the adverse party, ordinarily may be required to be produced, although New York, of course, places itself in a minority...." (Footnote omitted). Appleman, 20B Insurance Law and Practice, § 12082, pp. 624-630 (1980 ed.).
Here, the statements were made before an "official" investigation began. See Nordeide v. Penn. Railroad Co., 73 N.J. Super. 74, 78, 179 A.2d 71 (Law Div. 1962). In any event, partial disclosure of the communication by the witness (i.e., Cincotta) would also constitute a waiver. Evid.R. 37; see In the Matter of Grand Jury Subpoenas, 241 N.J. Super. 18, 31, 574 A.2d 449 (App.Div. 1989); Sicpa North America v. Donaldson Enterprises, Inc., 179 N.J. Super. 56, 430 A.2d 262 (App.Div. 1981); see also 8 Wigmore on Evidence § 2327 at 635 n. 3 (McNaughton rev. 1961).
*100 We need not rely solely on whether the statements were taken under such circumstances that they should not be considered privileged as work product under R. 4:10-2(c) and Evid.R. 26. We hold that where a fact witness testifies for an adverse party, the factual statement of that witness must be produced on demand for use in cross-examination as a potential tool for impeachment of credibility.
The failure to allow plaintiffs' attorney access to copies of those statements for cross-examination was harmful error in view of the obvious credibility conflicts, and requires reversal and remand for a new trial. See Hess v. Hess, 83 N.J. Super. 583, 200 A.2d 627 (App.Div. 1964) (court determined that plaintiff's investigator's report should have been produced to test credibility of his testimony on cross-examination, however, since no substantial variation existed between the report and the investigator's testimony, no prejudicial error occurred). See also In re Tufi Application, 182 N.J. Super. 631, 641, 642, 442 A.2d 1080 (App.Div. 1981), certif. denied 91 N.J. 189, 450 A.2d 525 (1982).
Reversed and remanded for a new trial.
NOTES
[1] Elliott Dinter filed a per quod claim. For convenience, reference to plaintiff or Dinter in the singular refers to plaintiff Riki Dinter unless otherwise stated.
[2] We directed defense counsel at oral argument to furnish us and plaintiffs' attorney with copies of the statements by Sears employees. The other two statements were equally short, but contrasted to Cincotta's statement, were essentially innocuous and consistent with their testimony. On that basis, any error with respect to those two statements was harmless.
[3] Although Dinter contends she went to Sears to file the accident report and then proceeded to her doctor's appointment "the following day," in fact she did both two days later on February 19, 1987.
[4] Plaintiff was represented by other counsel at the time of trial.
[5] We note that defendant's answers to plaintiffs' interrogatories do not deny the existence of any statements. Rather, the answer is generally vague. In effect, they respond by saying subject to further discovery.
[6] Defendant's trial attorney did represent to the trial judge that a written policy existed, apparently from the insurance company's legal department, setting forth claims procedures. There was no proffer that the employees acted in accordance with that policy.