**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2604-15T1

R.P.B.,

    Plaintiff-Respondent,

v.

D.R.,

    Defendant-Appellant.

_____

Argued March 1, 2017 – Decided August 29, 2017

Before Judges Fuentes, Carroll and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FV-21-0354-16.

Michael R. Ascher argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito & Frost, attorneys; Mr. Ascher and Bonnie C. Frost, on the brief).

Respondent has not filed a brief.

PER CURIAM

Defendant appeals from a January 14, 2016 final restraining order (FRO) entered against her in favor of plaintiff pursuant to

the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

We summarize the relevant facts. Plaintiff is a carpenter contractor and defendant is one of his former clients. The parties had a brief dating relationship from September to November 2015. On January 7, 2016, plaintiff filed a complaint against defendant seeking injunctive relief under the PDVA alleging that she had committed acts of domestic violence, specifically harassment under N.J.S.A. 2C:33-4, by sending plaintiff numerous e-mails on January 2, 3, 4, 5 and 6, 2016.

The Family Part judge conducted a final hearing on January 14, 2016. Both parties were self-represented and were the sole witnesses at the hearing. During the hearing, plaintiff testified that after the dating relationship ended, he cancelled a pending construction project at defendant's home, which involved building a wall unit. However, in 2015, on Thanksgiving Day, defendant called and emailed plaintiff several times insisting that she would bring a cash deposit for the cancelled job to plaintiff's residence.

In response, plaintiff told defendant not to bring the money because she did not owe him anything. In addition, plaintiff told defendant to "leave [him] alone, and that [he] was going to return her money." Defendant ignored plaintiff's requests and left an

"envelope full of cash" under a rock at plaintiff's residence on Thanksgiving, while indicating that plaintiff did not have to "do the work for her." Subsequently, on November 30, 2015, plaintiff obtained a certified cashier's check and returned the money defendant had left at his house on Thanksgiving along with "a letter asking her to leave [him] alone" and again cancelling the pending construction project.

Nonetheless, according to plaintiff, between November 28 and December 18, 2015, defendant called him "approximately [thirty]" times. Although he ignored most of the calls, he admitted answering a call from defendant on December 18 because he did not recognize the incoming number. During that conversation, plaintiff "emphatically asked [defendant] to please leave [him] alone again, and [he] explained to her that if she didn't stop . . . that [he] would file for a restraining order[.]"

Thereafter, plaintiff went on vacation to Morocco in North Africa. He returned on January 6, 2016. According to plaintiff, over a five-day period from January 2 to January 6, 2016, defendant sent him approximately forty-five emails, all of which he ignored. Generally, in the emails, defendant accused plaintiff of hacking her electronic devices, an accusation plaintiff denied, and expressed frustration over the relationship ending and plaintiff not responding to her numerous messages.

A-2604-15T1

On January 2, 2016 at 10:43 p.m., plaintiff received the first in the series of emails from defendant with an attachment stating:

> You treated me like shit. Wouldn't take my calls or speak to me. You then want sexy pictures of me.
>
> In addition, I don't know if you have been spying on me for two months. I figured this out a couple of . . . weeks ago. You sneak a HI on POF, [referring to "a dating site called Plenty of Fish"]. You took advantage of my insecurities after my divorce. Invading my privacy and deleting files is much worse than any stalking, threat, or [sic] I made it within inches of your property.
>
> The vast majority of the calls were to resolve business issues.
>
> I know you still like me -- in parentheses -- but maybe find it hard to deal with those feelings and have had some of the best sex we've both ever had.
>
> Is it too difficult to say you are sorry[?] . . . That's all I'm looking for, an acknowledgment that you treated me badly . . . the last month and we should resolve our petty issues.
>
> You spoke about honesty many times, that's where I want to start at, no spying, and to treat me better. I'm a good person. And with regard to sex, getting better and better, but maybe that's not what you want. If so, admit you want one tramp after the other. But I think you're still hung up on me. You let me believe that I liked you more, but you couldn't admit the opposite . . . when I had a date with Vin [referring to "one of her previous boyfriends"] I think your words

4

were, I have one up my sleeve, as though it
was a competition.

The following day, January 3, 2016, plaintiff received sixteen emails from defendant pestering him for not responding. One of the emails accused him of "monitoring all of [her] devices: PC's, tablets, phone or just [her] Lenovo PC" and threatened that she would "figure it out." On January 4, 2016, plaintiff received four separate emails from defendant, accusing him of "gathering information for a harassment suit against [her]" and of invading her privacy, and admitting that she trespassed on his property and made a number of calls. In one of those emails, defendant also "strongly recommend[ed]" that they meet at her house "on the evening after [he] returned" from vacation "for [plaintiff] to explain to [defendant] why [he was] invading [her] PC without permission."

On January 5, 2016, plaintiff received six additional emails from defendant. Beginning at 3:19 a.m., plaintiff received an email from defendant including a picture that plaintiff had posted on his Twitter account depicting him riding a four-wheeler. Plaintiff suspected that defendant used "a search engine called www[.]picturetrail.com" to locate the image online. Defendant sent plaintiff a second email, just four minutes later at 3:23 a.m., which included additional screen shots of pictures of

plaintiff from his online public profiles. That same day, plaintiff received a third email from defendant at 8:32 p.m. stating plaintiff owed her "roughly $4,600 compensation for chasing [him] for the last [four] days" and attributing the slow speed on her computer to plaintiff "still [being] in [her] files." Later that day, plaintiff received another email from defendant stating "[w]hatever you tried to send failed two times." However, plaintiff denied attempting to make contact with defendant on January 5, 2016, and refuted defendant's claim that he had a friend attempt to communicate with her on his behalf.

On January 6, 2016, plaintiff received fifteen additional emails from defendant. Defendant sent plaintiff a string of emails at 5:08 a.m., 5:11 a.m., 5:15 a.m., and 5:20 a.m., in which the content of each looped into one another. Defendant wrote:

> I will send you a bill for the amount it cost to have all of this removed from my devices. . . . Includes a phone, laptop, three tablets, and a new router, which you saw. . . . [A]nd as I mentioned, [you] should also include my time for the lack of real work for about $4,500.
>
> . . . .
>
> [Y]ou also stole some files of mine. I want all of them back. Whether they related to you or not, they were my files. I did not give or offer them to you.
>
> . . . .

There was also a word document that had all of my pics that was not yet returned, among other files. Again, you should bring your PC with you tomorrow, actually both of them and all thumb drives you have.

. . . .

I am still expecting my wall unit by the end of January.

That same day, defendant sent another email at 7:34 a.m. stating, "did you contemplate that your tech friend now has all my personal and financial data now. I will need to spend all weekend changing bank accounts, credit cards, passwords, et cetera." Later, at 10:31 a.m., defendant emailed,

I am now wasting hours of work in the office . . . because you are fucking around with my files and passwords. Can't you just leave me alone. Getting a big kick and laughter at my expense. I can't even type because my eyes are welling up. Are you satisfied with that now[?]

Throughout the remainder of the day, defendant sent plaintiff additional emails at 2:31 p.m., 2:43 p.m., 2:49 p.m., 6:30 p.m., and 7:53 p.m., similarly alleging that plaintiff was hacking her devices, wasting her time by forcing her to get her "devices fixed[,]" and expressing frustration that he would not respond to her messages. The 2:31 p.m. email stated

I just can't comprehend what I . . . could have possibly done to deserve this. No, I am consumed in a whole different way. I have to

dial in to meetings rather than go in person, because my eyes are red and swollen.

I've said this already, but I just don't get it and I am so pissed at myself for being naïve and buying into your bullshit. I said I was a skeptic. This just reinforced to be one even more so.

The 2:49 p.m. email stated in part, "I hope you got the humor you were hoping for, my entire digital life to bring you countless hours of humor, now and going forward."

Plaintiff testified that he did not respond to any of defendant's repeated emails. He explained that defendant was "badgering [him] regarding the emails or regarding the files" and he reiterated he had "no idea what she's talking about" and "no connection to that at all." When asked by the judge whether he feared for his safety, plaintiff specifically stated:

I'd say yes, it's pretty alarming to have someone bring money to your house when you've asked them not to do it, for a job you're not doing.

Our business relationship had long been over at that point. And her insistence on coming to my house on a Federal holiday is quite, you know, quite alarming.

Plaintiff explained that he sought a restraining order against defendant because he does not want "to be annoyed at work all the time . . . or annoyed at home all the time[.]"

8

Defendant declined the court's invitation to cross-examine plaintiff. In her defense, defendant admitted sending approximately forty-five emails to plaintiff between January 2 and January 6, 2016, after receiving plaintiff's December 2, 2015 letter with a certified cashier's check returning her money for the cancelled job and asking her not to contact him again. However, she explained that her conduct was motivated by her belief that plaintiff was hacking into her devices, rather than a purpose to harass him. Defendant explained that she continued to contact plaintiff because she believed he was "orchestrating . . . spyware" or installing software on her computer. Her belief was based on the type of data that was targeted.

To support her contention, defendant testified that she "saw flashing" on her computer, her "machine was extremely slow," and she "had pictures on [her] machine that [she] had no way of getting." Defendant also testified that she was "missing pictures on [her] phone[,] . . . virtually every text . . . [and] every email" between her and plaintiff. However, when questioned by the court, defendant could not provide a plausible explanation for how these occurrences were connected to plaintiff. Defendant explained "the malware that I suspected . . . was causing part of the problem was dated October 30th[, 2015] and . . . the last time that [plaintiff] was at my house was October 31st[, 2015.]"

Defendant testified that she had taken her computer to be evaluated by two experts; a forensics expert at Prudential where defendant was employed, and a computer expert at Best Buy. In addition, defendant stated that her administrative assistant witnessed files disappear from her computer. Defendant also spoke to a Norton Antivirus representative on the phone who told her "he saw about [twenty] or [twenty-five] computer IP addresses, foreign IP addresses, on [her] phone." Defendant explained that she thought the information about "those foreign IP addresses [was] important" because if they "correlated to the places where [plaintiff] was," it would confirm that she was being hacked and that plaintiff was "the hacker[.]" However, the court ruled that without the expert "here to testify[,]" plaintiff's testimony regarding a phone call she had with a Norton representative constituted inadmissible hearsay evidence that could not be considered by the court.

At plaintiff's request, the court asked why defendant started her communications with plaintiff on January 2, 2016, with "relationship issues" if she suspected that plaintiff was hacking into her devices. Defendant provided a convoluted answer explaining that she did not understand the question and that she could not "speak to dates" because the "forensics" on her devices were not completed. At plaintiff's request, the court also asked

defendant why she waited "so long to take [her] devices to the experts, if [she] believed, back in December, that . . . [plaintiff] somehow committed . . . a breach of [her] security in [her] devices." Defendant replied, "I'm just guessing . . . . I'm not sure that I had the time to literally go out and investigate and give up my computer . . . . if I'm behind with work and trying to get caught up with work." Defendant offered to come back to court later with her devices and supporting information, but the court denied her request.

In an oral opinion rendered immediately after the hearing, the judge found that the entry of a FRO was justified. Initially, the judge determined that the parties were subject to the jurisdiction of the PDVA by virtue of their dating relationship. Applying the two-prong Silver[1] analysis, under the first Silver prong, the judge found by a preponderance of the evidence that defendant committed the predicate act of harassment, pursuant to N.J.S.A. 2C:33-4(a) and (c), based on her "barrage of emails about their relationship" sent to plaintiff after he "sent to defendant, by certified and regular mail on November 30th, a cancellation for the work he was doing for her, a return of her payment on account

---

[1] Silver v. Silver, 387 N.J. Super. 112 (2006).

of that work, and a letter saying don't contact me anymore, it's over."

Finding plaintiff's testimony "far more credible because of the logic and rational nature of his testimony, as opposed to defendant's which was all over the place," the court rejected defendant's claim "that the only reason she contacted . . . plaintiff [was] because she felt that he had installed some kind of malware in her electronic devices[.]" The court concluded that defendant's purported "issues about her computer" were a pretext to contact plaintiff "about their relationship." The court considered the history of plaintiff receiving "[thirty] plus phone calls" from defendant "between November 30th and December 18th" and plaintiff telling defendant on December 18, 2015, "when he answered such a call, that he wanted her to leave him alone[.]"

The court concluded that defendant's "ultimate purpose was to get plaintiff to respond to [her] and to get him to engage in a dialog[ue] with [her]." The court explained:

> But the immediate objective was to make all kinds of accusations about the relationship, about things he sent her that he actually never sent her, to refer to issues that were made up in her mind to get him to engage.
>
> And that kind of behavior is certainly intended to annoy him and possibly alarm him in some respects . . . .

A-2604-15T1

So I do find a purpose to harass both annoying and alarming, depending on which made-up accusation one is talking about.

. . . .

And certainly these communications, especially the ones about suggesting that he owed her money, and suggesting that he had responded to her, installed malware on her computer, and other similar accusations, would cause the annoyance and the alarm, . . . that she intended.

The court determined further that entry of the FRO was necessary under the second Silver prong to protect plaintiff and prevent further abuse. The court described defendant's behavior as "[bordering] on the obsessive . . . . These many emails with made-up . . . accusations . . . or based on made-up communications, made-up malware installations, made-up stories involving the plaintiff, smacks of the obsessive." The court explained:

> [Plaintiff's] fear is that there will continue to be an alarming number of emails, and . . . phone calls, and text messages intruding into his life. He just wants to be left alone and not to be annoyed at work or at home. He has a life and he wants to continue with it without defendant and without intrusion from her.

This appeal followed. On appeal, defendant argues that the evidence was insufficient to sustain a violation under the PDVA. Defendant also argues that she was deprived of due process because the court's procedural and evidentiary errors precluded her from

presenting a defense that plaintiff had hacked into her computer. Specifically, defendant asserts that the court should have adjourned the case sua sponte to afford her the opportunity to bring in her witness and computer expert to establish her intent and state of mind. Defendant also argues that the court mischaracterized her computer expert evidence as inadmissible hearsay when it was not sought for the truth of the matter asserted but rather to explain her resulting belief and actions.

Factual findings of the trial court should not be disturbed unless they "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Deference to the trial court's factual findings "is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility[,]'" ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)), and "[b]ecause of the family courts' special jurisdiction and expertise in family matters[.]" Id. at 413. Reversal is warranted only "if the court ignores applicable standards[.]" Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008).

The PDVA provides that a FRO may be issued if the court determines "by a preponderance of the evidence[,]" N.J.S.A. 2C:25-

29(a), that the defendant has committed an act of domestic violence "upon a person protected under" the PDVA, N.J.S.A. 2C:25-19(a). A person protected under the PDVA includes "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d). The term "domestic violence" is defined in N.J.S.A. 2C:25-19(a) to mean "the occurrence of one or more" specified acts, known as predicate acts, including harassment. N.J.S.A. 2C-19(a)(13).

A person commits the offense of harassment if, "with purpose to harass another," he or she

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> . . . .
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a), (c).]

Harassment requires that the defendant act with the purpose of harassing the victim and judges must be mindful that "a party may mask an intent to harass with what could otherwise be an innocent act." J.D. v. M.D.F., 207 N.J. 458, 488 (2011). "A finding of a purpose to harass may be inferred from the evidence

presented" and a judge may use "[c]ommon sense and experience" when determining a defendant's intent. State v. Hoffman, 149 N.J. 564, 577 (1997). To that end, an analysis of whether an underlying act of harassment in the context of domestic violence has occurred requires consideration of the totality of the circumstances to determine whether the harassment statute has been violated. Id. at 584-85.

Pursuant to Silver, supra, 387 N.J. Super. at 125-26, when determining whether to grant a FRO under the PDVA, the judge must make two determinations. Under the first Silver prong, the judge "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. [2C:25-19(a)] has occurred." Id. at 125.

> Although a court is not obligated to find a past history of abuse before determining that an act of domestic violence has been committed in a particular situation, a court must at least consider that factor in the course of its analysis. Therefore, not only may one sufficiently egregious action constitute domestic violence under the Act, even with no history of abuse between the parties, but a court may also determine that an ambiguous incident qualifies as prohibited conduct, based on a finding of [abuse] in the parties' past.
>
> [Cesare, supra, 154 N.J. at 402.]

A-2604-15T1

Under the second Silver prong, a judge must also determine whether a restraining order is required to protect the plaintiff from future acts or threats of violence. Id. at 126-27. Although the latter determination "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. [2C:25-29(a)(1) to -29(a)(6)], to protect the victim from an immediate danger or to prevent further abuse." A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016) (quoting Silver, supra, 387 N.J. Super. at 127).

We are satisfied there is sufficient credible evidence in the record to support the judge's finding that defendant committed acts of harassment, as defined in N.J.S.A. 2C:33-4(a) and (c), by sending plaintiff approximately forty-five emails over the course of five days after he repeatedly told her to leave him alone and returned her deposit for the cancelled project. Given defendant's conduct, which was aptly described by the judge as bordering on the obsessive, the judge's rejection of defendant's claim that she did not have the requisite purpose to harass is amply supported by the record. We are also convinced that the record supports the judge's determination that a FRO was required to protect plaintiff and prevent further acts of harassment. Defendant's argument that

the evidence was "insufficient to sustain a finding of a violation" of the PDVA under <u>Silver</u> is simply belied by the record.

Defendant also argues that the court failed to provide her with "a fair, full and meaningful hearing, violating [her] rights to due process." Specifically, defendant argues that her right "to present a defense was vitiated" by the court's failure to inform her of her ability to obtain "an adjournment or continuance of the trial" in order to marshal evidence of the suspected hacking from her expert and her administrative assistant. According to defendant, such evidence was vital to establish "the non-harassing reasons for the communication" and thereby disprove the requisite mental state for harassment. Further, defendant asserts that the court "mistakenly deemed reference to outside experts as hearsay which it could not consider" when the evidence "was not presented to prove the truth of what the experts might have told her" but rather "to establish her state of mind" and "belief about the hacking[.]"

Both the Fourteenth Amendment to the United States Constitution and Article I, paragraph 1, of the New Jersey Constitution protect the due process rights of defendants in actions brought under the PDVA. <u>H.E.S. v. J.C.S.</u>, 175 <u>N.J.</u> 309, 321 (2003). In the context of a domestic violence case, minimal due process requires "notice defining the issues and an adequate

opportunity to prepare and respond."  Id. at 321-22 (quoting

McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559

(1993)).  A domestic violence defendant is also entitled to have

the opportunity to cross-examine witnesses and to call witnesses.

Peterson v. Peterson, 374 N.J. Super. 116, 125 (App. Div. 2005).

We are satisfied from our review of the record that the

hearing below complied with the due process requirements outlined

above.  Defendant received notice that she was a defendant in a

domestic violence case and notice of the allegations contained in

the complaint at 5:30 p.m. on January 7, 2016.  Defendant did not

request an adjournment before the final hearing was conducted on

January 14, 2016.  This is in sharp contrast to the defendant in

H.E.S., whose request for an adjournment was denied and who was

given inadequate notice and insufficient time to prepare.  Id. at

324.

Here, in accordance with the PDVA, a final hearing was held

"within [ten] days of the filing of [the] complaint[,]" N.J.S.A.

2C:25-29(a), and no new allegations were made at the final hearing.

While a trial judge is not precluded from granting a continuance

so that a party may prepare for trial, the right to a continuance

in appropriate circumstances is not self-executing and a party who

has not had an adequate opportunity to prepare for a final hearing

must affirmatively seek a continuance.  See H.E.S., supra, 175

N.J. at 323. Accordingly, we reject defendant's argument that the judge erred in failing to grant an adjournment that was never sought.

Likewise, we reject defendant's assertion that the judge's evidentiary ruling regarding her discussion with an outside expert constituted reversible error. "As a general rule, admission or exclusion of proffered evidence is within the discretion of the trial judge whose ruling is not disturbed unless there is a clear abuse of discretion." Dinter v. Sears, Roebuck & Co., 252 N.J. Super. 84, 92 (App. Div. 1991), certif. denied, 140 N.J. 329 (1995) (citations omitted). Evidence with probative value to a material issue is relevant, N.J.R.E. 401, and "all relevant evidence is admissible" unless excluded by evidential rule or statute. N.J.R.E. 402.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[,]" N.J.R.E. 801(c), and "is not admissible except as provided by [the Rules of Evidence] or by other law[,]" N.J.R.E. 802. Here, contrary to defendant's argument, her intent in introducing the statement made to her by the Norton computer expert was to prove the truth of the matter asserted, specifically, to establish that her computer was, in fact, hacked and that plaintiff was, in fact, the hacker. As a

result, we discern no abuse of discretion in the judge's evidentiary ruling excluding the testimony.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2604-15T1