202 N.J. Super. 255 (1985)
494 A.2d 834
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT PAVIN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 17, 1985.
Decided June 19, 1985.
*257 Before Judges FRITZ, GAULKIN and LONG.
John M. Skevin, attorney for appellant (Cathe McAuliffe, on the brief).
Irwin I. Kimmelman, Attorney General, attorney for respondent (Kenneth M. Denti, Deputy Attorney General, of counsel and on the letter brief).
The opinion of the court was delivered by LONG, J.A.D.
After a jury trial, Robert Pavin was convicted of the crime of fourth degree death by auto, contrary to the provisions of N.J.S.A. 2C:11-5. He was sentenced to 300 days in the Morris County jail and a fine of $3000. This appeal ensued in which Pavin raises the following issues:
POINT I: Under the attorney client privilege, the communication between the defendant and Joseph Bodnar is a protected communication as between an insurer and its insured and any testimony by Joseph Bodnar should not have been admitted into evidence.
POINT II: The communication between the insurance adjuster, Joseph Bodnar, and defendant, Robert Pavin, was involuntary based on the totality of the circumstances and, therefore, Joseph Bodnar's testimony regarding that communication should not have been admitted into evidence.
POINT III: The sentence defendant, Robert Pavin, received was excessive and it should be modified to comply with the guidelines set forth in N.J.S.A. 2C:44-1(a), (b), (e), (f).
We have carefully analyzed this record and have concluded that Pavin's arguments as to the inadmissibility of his communications with the insurance adjuster are without merit.
The facts which undergird this appeal are as follows: On December 18, 1982 at approximately 7:30 p.m. Pavin, using his mother's car, drove his friend William Rhodes to the Firehouse Pub in Wharton. The men played pool and consumed eight or *258 ten drinks apiece over the course of nearly six hours. At 2:00 in the morning they left the bar. Thereafter, they were involved in an accident on Route 80. According to Willis, who was the driver of the other vehicle involved in the accident, the Pavin car was traveling at 85 to 90 miles per hour just prior to the time that it hit the rear of his vehicle. When the police arrived at the scene they found Pavin and Rhodes in the eastbound lanes of Route 80. Pavin was face down 16 feet from his car, covered with blood and unconscious, but still breathing. Rhodes, who was not exhibiting signs of life, was lying face down 42 feet away from Pavin's car. It was stipulated that Rhodes died as a result of this accident.
The only testimony as to who was driving the Pavin car came from Joseph Bodnar, an insurance adjuster for Pavin's mother's insurance company. According to Bodnar, ten days after the accident he went to the hospital to interview Pavin, having received permission for the interview from both Pavin's mother and his doctor. Bodnar testified that his purpose in interviewing Pavin was to get his version of the accident in order to evaluate the insurance company's exposure to liability.[1] Bodnar utilized his regular format in taking the statement from Pavin. He first inquired regarding Pavin's identity and personal background; then he addressed himself to the insured vehicle involved in the accident; next he interrogated Pavin regarding weather and road conditions, and finally, he asked for an account of the accident itself, including the nature of the injuries. He made every attempt to write down the answers as *259 accurately as possible and to use Pavin's own words. Although Bodnar handwrote a three-page statement which he asked Pavin to sign at the conclusion of the interview, Pavin refused to sign it because his mother had been advised by an attorney that he should not do so. Instead, Bodnar left a copy of the unsigned statement with Pavin.
According to Bodnar's testimony, during his conversation with Pavin in the hospital Pavin revealed that he was quite intoxicated when he left the bar on the night of the accident but did not think he would have problems driving. He remembered getting into his car, starting to drive, and proceeding on the entrance ramp to Route 80 eastbound. He could remember nothing of the accident itself which occurred several miles down the road. Prior to the trial Pavin filed a motion to suppress with respect to this testimony, which motion was denied.
Pavin's mother testified at trial that Pavin did not regain consciousness until 7:30 on the morning following the accident and that he had sustained severe injuries. John Weed, a friend of Pavin, also testified on his behalf, indicating that he had seen Rhodes driving Pavin's car on several occasions. Pavin testified at trial that he recalled nothing after midnight on the night of the accident since he "blacked out" from drinking. He affirmed Weed's testimony that Rhodes had previously driven his mother's car. Pavin claimed that he had lied to the insurance adjuster when he said he was driving the car on the night of the accident because he feared he would be denied insurance coverage. On cross examination the State produced Pavin's sworn affidavit wherein he alleged that he did not remember what he had told the insurance adjuster. Pavin admitted that this statement in the affidavit was not truthful and further admitted that when he stated in the affidavit that he had answered all the adjuster's questions to the best of his ability, this was not true since he had deliberately lied about who was driving in order to obtain insurance coverage.
*260 Pavin's attorney moved to dismiss claiming that the only evidence that Pavin was the driver of the automobile came from Bodnar, that Bodnar's evidence was inadmissible and that the State had therefore failed to prove an essential element of the case. The trial judge declined to eliminate Bodnar's testimony as privileged, concluding that Pavin's communications to Bodnar lost their privileged character because they were made in furtherance of fraud or deception.
In support of his claim that his conversation with Bodnar was privileged, Pavin has asked us to hold that New Jersey's attorney-client privilege embodied in Evid.R. 26 and N.J.S.A. 2A:84A-20 applies to a communication made by an insured to his liability insurance adjuster. Evid.R. 26(1) provides that communications "between lawyer and his client in the course of that relationship and in professional confidence, are privileged...." This privilege has been extended to encompass agents or representatives of the lawyer, who are thus also forbidden from violating the confidences of a client. L.J. v. J.B., 150 N.J. Super. 373, 376-377 (App.Div. 1977). See also State v. Mingo, 77 N.J. 576 (1978) (handwriting expert retained by criminal defense attorney for his client); State v. Kociolek, 23 N.J. 400 (1957) (psychiatric expert retained by criminal defense attorney for his client); State v. Tapia, 113 N.J. Super. 322 (App.Div. 1971) (public defender's investigator); Conforti & Eisele, Inc. v. Div. of Bldg. & Constr., 170 N.J. Super. 64 (Law Div. 1979) (engineering expert retained by attorney in action on construction contract).
It is the lawyer-client relationship with the concomitant communication by the client of information upon which legal advice by the lawyer will be based which is the crucial factor. Thus, the existence of the privilege depends upon whether the communication occurred while the client consulted the lawyer or his representative for the purpose of retaining the lawyer or securing a legal service or advice from him in his professional capacity. L.J. v. J.B., supra, 150 N.J. Super. at 377-378. "[T]he sine qua non of the privilege is that the client has *261 consulted the lawyer in the latter's capacity as an attorney." Id. at 377. The burden of proof is on the person asserting the privilege to show that the consultation was a professional one. Id. at 378.
No case in New Jersey has dealt directly with the insurance adjuster situation although numerous out of state cases have addressed the issue with differing conclusions. Annotation, "Privilege of communications or reports between liability or indemnity insurer and insured," 22 A.L.R.2d 659 (1952). The cases which have held that communications between an insured and his claims adjuster are absolutely privileged assume that any such communication is made for the dominant purpose of transmitting information to an attorney for the protection of the insured's interests. In such case, it is irrelevant that the agent is not an attorney himself or that actual litigation has not yet commenced or may in fact never be commenced against the insured. See, e.g., State ex. rel. Cain v. Barker, 540 S.W.2d 50, 56-57 (Mo.Sup.Ct. 1976); Brakhage v. Graff, 190 Neb. 110, 206 N.W.2d 45, 47-48 (Sup.Ct. 1973); People v. Ryan, 30 Ill.2d 456, 197 N.E.2d 15, 17 (Sup.Ct. 1964); Vann v. State, 85 So.2d 133, 138 (Fla.Sup.Ct. 1956); Cataldo v. County of Monroe, 38 Misc.2d 768, 238 N.Y.S.2d 855, 858 (Sup.Ct. 1963).
Those cases which have concluded that communications between an insured and his adjuster are not per se privileged note that an insurance carrier has the right to review and consider an insured's statement for any legitimate purpose connected with the company's business, such as coverage, cooperation, or renewal. The statement is ordinarily used by the insurer to determine whether and on what basis adjustment of the claim could be attempted. Only if adjustment is not effected and a claim is pursued, will the information be turned over to counsel for use in litigation. If the insured gives a false statement, or a statement which supplies facts regarding some other defense against the insurer's liability under the policy, the insurer can make use of those facts to the detriment of the insured. Thus these cases say that the relationship is not automatically comparable *262 at all stages to that of attorney and client, since it is not at all clear that the insured's interests are being protected by the insurance carrier. See, e.g., Butler v. Doyle, 112 Ariz. 522, 544 P.2d 204, 207 (Sup.Ct. 1975); Heidebrink v. Moriwaki, 38 Wash. App. 388, 685 P.2d 1109, 1112-1113 (Ct.App. 1984); Jacobi v. Podevels, 23 Wisc.2d 152, 127 N.W.2d 73, 75-76 (Sup.Ct. 1964). In Gene Compton's Corp. v. Superior Court, 205 Cal. App.2d 365, 23 Cal. Rptr. 250, 256-257 (Ct.App. 1962) the court, in considering the question, focused on whether the communication was made for the purpose of transfer to an attorney for representation of the insured.
We believe that the latter is the better view. Thus, no blanket privilege with respect to communications between an insured and his adjuster should be countenanced. Rather the privilege should be held to shield communications between the insured and the adjuster only where the communications were in fact made to the adjuster for the dominant purpose of the defense of the insured by the attorney and where confidentiality was the reasonable expectation of the insured. In our view, this middle ground comports with the language of N.J.S.A. 2A:84A-20 and Evid.R. 26 and best serves the purposes of those enactments as documented in our prior cases. Moreover it has support in the caselaw in other jurisdictions. In Heidebrink v. Moriwaki, supra, the Washington Court of Appeals rejected the defendant's effort to apply the attorney-client privilege because the court found that the defendant did not believe that the conversation with the insurance adjuster was in essence a communication between a client and his attorney.
The court held that:
There was no evidence such was Mr. Moriwaki's intent [to make a confidential communication to his legal representative] because: (1) The statement was not made by or at the direction of any attorney. (2) There was nothing in the record to indicate an intent on the part of the client that he was consulting with an attorney for the purpose of obtaining legal advice. (3) There was no pending litigation. (4) The insurance company conceivably had interests other than protecting the rights of the client.... [685 P.2d at 1112.]
*263 Applying this standard, Pavin's communications to the adjuster clearly fall outside the scope of the privilege. Here the insurance adjuster interviewed Pavin only 10 days after the accident, before any litigation was commenced or any claim pursued. There was no evidence before the court that the insurance adjuster was acting in accordance with instructions from his employer's attorney, or that an attorney had even been retained by the carrier to review the file. At this early stage, the adjuster was representing the interests of his principal, the insurance company, and not those of the insured.
We are satisfied that even if we were among those jurisdictions according general applicability to the privilege, the peculiar facts in this case would not justify our placing an imprimatur on its invocation. While we are mindful of the importance of the privilege, as the Supreme Court has noted in Matter of Kozlov, 79 N.J. 232 (1979) the decision as to its applicability involves balancing the public interest in the search for truth against the client's expectation of privacy in consulting his legal advisor. Pavin's expectation of privacy was non-existent in this case in that he did not conceive of Bodnar as his legal adviser even in the most attenuated way. Indeed, after Bodnar took his statement, Pavin refused to sign it "on the advice of an attorney." Moreover, in light of the purpose of the privilege, which is to encourage openness and candor between client and his legal adviser, we see absolutely no public policy interest which would be advanced by granting privileged status to a purported lie which Pavin told to Bodnar for the sole purpose of obtaining coverage under his mother's insurance policy.
Nor can any equitable argument be made here in Pavin's favor. During the motion to suppress, Judge Egan was faced on the one hand with Pavin's assertion of the attorney-client privilege and on the other with a certification from Pavin indicating that he had carefully constructed a story for Bodnar only to obtain the insurance coverage to which he believed he was not otherwise entitled. In essence, Pavin admitted attempting *264 to perpetrate a fraud on the insurer when the statement was made to Bodnar. Evid.R. 26(2) provides that the privilege should not extend to a communication made in aid of the course of the commission of a crime or a fraud. Deception and deceit in any form is sufficient to dissipate the privilege, since public policy demands that the fraud exception be given its broadest interpretation. In re Callan, 122 N.J. Super. 479, 496 (Ch.Div. 1973), aff'd 126 N.J. Super. 103 (App.Div. 1973), rev'd on other grounds 66 N.J. 401 (1975). We are well satisfied that Judge Egan properly applied this exception to the privilege and that Bodnar's testimony was properly admitted.
Pavin's alternative argument, that his statement to Bodnar should not have been allowed since it was not voluntarily made because of his mental and physical disabilities, is entirely insubstantial. The cases he cites are clearly distinguishable as involving the compulsion of testimony through state action in contravention of the Fifth and Fourteenth Amendments. U.S. Const., Amend. V; U.S. Const., Amend. XIV § 1. None of those cases bears in any way upon an exchange between two private citizens. More importantly, as the State has correctly noted, Pavin produced no evidence directly establishing the debilitation of his physical or mental condition on the day in question. On the contrary, Bodnar attested to Pavin's rationality and alertness throughout the interview which testimony was uncontroverted.
We find the sentencing issue raised by Pavin to be more difficult. He claims that the 300 day term of incarceration was excessive and that it requires modification. The heart of Pavin's argument is that the trial judge failed to adhere to the sentencing guidelines in determining the punishment to be imposed upon him. State v. Roth, 95 N.J. 334 (1984); State v. Hodge, 95 N.J. 369 (1984). More particularly, as Pavin correctly points out, he was convicted of a fourth degree offense (N.J.S.A. 2C:11-5) which bears with it a presumption of nonincarceration for a first offender. N.J.S.A. 2C:44-1(e). That presumption *265 may only be overcome if "having regard to the nature and circumstances of the offense and the history, character and condition of the defendant, [the judge] is of the opinion that his imprisonment is necessary for the protection of the public under the criteria set forth in subsection a [N.J.S.A. 2C:44-1(a)]." N.J.S.A. 2C:44-1(e). Here the sentencing judge made no finding, direct or oblique, that Pavin's imprisonment was in any way necessary for the protection of the public. He did consider the criteria established in N.J.S.A. 2C:44-1(a) however:
So, in this case, keeping in mind the general policy of the Court as it relates to aggravating and mitigating circumstances, I find that the nature and circumstances of the offense are a factor. I don't think for one second Mr. Pavin ever contemplated this sort of result, but how can you commit an offense involving a homicide and not consider that as an aggravating factor. So, I consider that to be the first aggravating factor.
Second is the gravity and seriousness of harm inflicted on the victim. I don't have to say anything beyond that. What is more harmful than a death?
....
Next, the need to deter the defendant and others. As far as others, I think I have talked ad nauseum about the need to deter other people from this sort of conduct.
....
As far as mitigating circumstances, I find the victim of the defendant's conduct induced or facilitated its commission. I have absolutely no doubt in my mind that Mr. Rhodes was as drunk as Mr. Pavin, and when you get in a car with somebody that is loaded, as Mr. Pavin was, how can you expect that that person is going to be a safe driver. So, while not trying to demean the dead Mr. Rhodes, he showed far less than what I would consider to be intelligent judgment in getting in that car.
The defendant has no prior history of delinquency or criminal activity. The defendant was a choir boy. I don't have to say any more than that. He has led an outstanding life. The defendant's conduct was a result of circumstances unlikely to recur. That, in all likelihood, is true. Even if he is drinking, I don't think we will ever see Mr. Pavin drinking and driving. Also the character and attitude of the defendant indicates he is unlikely to commit another offense. I agree. There's no way in the world Mr. Pavin is ever going to rob a bank or pass bad checks or commit some sort of an assault on someone. He is not likely to commit any other offense, as I see it.
The sentencing judge also noted the unusual outpouring of support for Pavin and the quality of that support:

*266 I have had enough letters from nuns and priests and monsignors that you almost have a question what Mr. Pavin is doing as a private citizen instead of being in the seminary because everybody knows him to be  from the first grade all the way through high school  said he's a great kid. Somebody referred to him as a tassel-hair red head in the letter. These weren't letters  as Mr. Skevin said, these aren't letters from just people because you may have some political clout or a lot of money, or whatever, and you get Governor Keane [sic] to write a letter on your behalf, even though he wouldn't know you if he fell over you, or you get some religious leader to write a letter only because you are a big contributor to the religious organization. These are letters from people that knew Mr. Pavin. So, there's no dispute, as far as him as a person, he is an outstanding person.
In addition the judge observed that:
There's no dispute as far as his employment. He has an excellent work record, and as far as a son for Mrs. Pavin after the father died when Bob Pavin was a young man, ten or 11, something like that, and his brother wrote. I have a letter from everybody in a sense, as a testimonial to this young man, and the biggest testimonial, of course, are the Rhodes, the parents of the decedent who probably, as Mr. Critchley says, if it were the other way around, if Mr. Rhodes had been convicted of this, we would have the same series of letters, and I doubt very much whether there would have been any problem in Mrs. Pavin writing a letter on behalf of Mr. Rhodes saying the same thing because, as the Rhodes say, there is little to be gained in deterring Robert Pavin from this conduct in the future because Robert Pavin, I am sure, would not engage in this conduct, but the Rhodes say that I should not incarcerate him because it will destroy someone who has never had to survive on his own.
The judge quoted and commented on the letter from the victim's parents:
They say, "Our Billy is gone. His life is finished and nothing can replace our loss, but destroying another human being's life would be totally against what our judicial system is all about." Obviously nice people with no sense of vengeance and also obviously very bright people because they, at least, have some idea as to what we are trying to do here.
The judge then concluded
[B]ut I find this particular case that the aggravating factors involving a death and the means in which the death took place outweigh the mitigating factors, that the presumption of no incarceration has been substantially outweighed by the preponderance of the aggravating factors.
We find the judge's reliance on the death of William Rhodes as an aggravating factor to be improper. The Legislature chose to make the crime of death by auto a fourth degree offense bearing the presumption of non incarceration for a first offender like Pavin. Implicit in a death by auto charge is the *267 death of a person. Death is therefore an element of the offense and not an aggravating factor justifying more significant punishment or overcoming the presumption of nonincarceration. In our view, by relying on an improper factor as an aggravating circumstance, the sentencing judge contravened the mandate of State v. Roth, supra, and State v. Hodge, supra. See State v. Link, 197 N.J. Super. 615 (App.Div. 1984); State v. Yarbough, 195 N.J. Super. 135 (App.Div. 1984). We therefore affirm the conviction but remand the case for resentencing with the direction that the judge may not rely on the basic elements of the offense as aggravating factors and that he make specific findings under N.J.S.A. 2C:44-1(e) as to the need for Pavin's incarceration in terms of "the protection of the public." We note particularly in this regard that we reject the State's contention that Pavin's character and attitudes should not be viewed as mitigating factors in this analysis. Indeed the opposite is true. For N.J.S.A. 2C:44-1(e) specifically requires the "history, character and condition" of Pavin to be scrutinized by the judge in the weighing and balancing process of determining whether incarceration is required.
Affirmed and remanded for resentencing in accordance with this opinion.
NOTES
[1] Although Pavin was not the policyholder or the owner of the vehicle in question, it is not disputed that he was covered by the policy, presumably by virtue of residing in his mother's household and by driving the vehicle with her permission. The State argued below that since Pavin was not the policyholder, only his mother could claim a privilege vis-a-vis the insurance company. According to the assistant prosecutor, the interests of Pavin, as driver, and his mother, as owner, could conceivably diverge at some point. This issue has not been addressed on appeal by either party and apparently has been abandoned by the State.