627 A.2d 602

WILLIE H. RAWLINGS, PLAINTIFF–APPELLANT, v.
POLICE DEPARTMENT OF JERSEY CITY, NEW
JERSEY, DEFENDANT–RESPONDENT.

Argued February 1, 1993—Decided July 13, 1993.

*Emanuel S. Fish* argued the cause for appellant (*Fish, Field, Olesnycky & Livingston,* attorneys; *Stacy I. Benson,* on the brief).

*Carol Zylbert,* Assistant Corporation Counsel, argued the cause for respondent (*Paul W. Mackey,* Acting Corporation Counsel, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

This case presents the issue whether defendant, Police Department of Jersey City (the department), violated the rights of plaintiff, Willie H. Rawlings, a police officer, under the Fourth and Fifth Amendments to the United States Constitution by directing him to submit a urine sample for mandatory drug testing. The department directed him to provide the sample pursuant to a departmental order that required officers to submit to testing on individualized reasonable suspicion that the officer unlawfully had used drugs. Plaintiff refused to obey the order following his

arrest on suspicion of possessing and distributing cocaine. Because of plaintiff's refusal, the department dismissed him for insubordination. An Administrative Law Judge (ALJ) upheld the validity of the departmental order and affirmed plaintiff's dismissal. The Merit System Board (Board) adopted the ALJ's report. In an unpublished opinion, the Appellate Division affirmed. We granted certification, 130 *N.J.* 18, 611 *A.*2d 656 (1992), and now affirm the Appellate Division's judgment.

–I–

Based on the ALJ's report, the Board found the following facts. On June 26, 1988, members of the Jersey City Police Narcotics Squad arrested plaintiff on suspicion of selling cocaine. At the time of his arrest, plaintiff was sitting in the driver's seat of his parked car. His passenger, Elwood Fowlkes, was talking through the open passenger-side window to Dennis Williams, who was standing on the sidewalk. When two detectives from the Narcotics Squad approached plaintiff's car, Williams threw a vial of cocaine to the sidewalk, and Fowlkes dropped two other vials of cocaine on the floor of the car. One of the detectives testified that he saw plaintiff drop an empty vial on the floor at plaintiff's feet. The Narcotics Squad detectives also saw money being exchanged for the cocaine. The only suspect with any money was plaintiff, who had a twenty-dollar bill in his hand.

Plaintiff, Fowlkes, and Williams were arrested and placed in a holding cell. Inspector John McAuley informed Richard Harrison, the head of the Narcotics Squad, that plaintiff at the time of his arrest should have been on duty at the police "car pound." McAuley directed Harrison to enforce departmental General Order 15–87 (the order), relating to "Law Enforcement Drug Screening Guidelines." The order provided in relevant part:

   (c) Officers will be required to submit to mandatory drug testing whenever there is individualized reasonable suspicion to believe that they have been unlawfully using drugs;

   (d) Officers who refuse to submit to lawful orders to undergo drug testing or who produce positive test results for unlawful drug use will be dismissed from employment. . . .

The order also mandated that the department implement the *Law Enforcement Drug Screening Guidelines* issued on October 22, 1986, by the Attorney General of New Jersey.

Harrison read to plaintiff *Miranda* warnings, see *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), and the order. Plaintiff placed a private telephone call to Officer John Reo, vice president of the Jersey City Police Officers' Benevolent Association (POBA), plaintiff's union. When Reo asked plaintiff if he had retained an attorney, plaintiff answered that he would call an attorney the following day. According to Reo, plaintiff next said that he doubted that he could pass the drug test and asked if he should comply with the departmental order. Reo told plaintiff that he was required to take the test, but added that if he, Reo, doubted that he could pass the test, he would refuse.

After the telephone call, Harrison again read the order to plaintiff, who refused to comply, stating that before he would consider submitting a urine sample he wanted to speak with his attorney. McAuley suspended plaintiff and issued a preliminary notice of disciplinary action charging him with violating General Order 610, which requires officers to obey and execute promptly the lawful orders of their superiors, such as General Order 15–87. After an internal hearing on July 26, 1988, the department dismissed plaintiff for insubordination.

In a related criminal proceeding, plaintiff was indicted for illegal distribution of a controlled dangerous substance and related offenses. At the criminal trial, Fowlkes testified that plaintiff did not know at the time of the arrest that he and Williams had possessed cocaine. Fowlkes testified further that plaintiff had received the twenty-dollar bill in payment for repairing a neighbor's air conditioner. The jury convicted Fowlkes but acquitted plaintiff.

Plaintiff appealed the dismissal to the State Department of Personnel, which forwarded the appeal to the Office of Administrative Law (OAL). The ALJ refused to quash a subpoena served on Reo, who then testified about his telephone conversation with

plaintiff. At the conclusion of the hearing, the ALJ sustained the charge of insubordination and the dismissal.

The Appellate Division stated that plaintiff had not challenged the Board's finding that the circumstances of his arrest gave rise to reasonable individualized suspicion that he had used illegal drugs. It also ruled that the attorney-client privilege did not protect plaintiff's telephone conversation with Reo. Finally, it rejected plaintiff's claim that he had refused to submit a urine sample because he was confused about the impact of the *Miranda* warnings or because he feared that the drug-test results could be used against him in a criminal proceeding.

## –II–

A drug test performed pursuant to a departmental regulation, such as General Order 15–87, is a search subject to the requirements of the Fourth Amendment. *O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 242, 624 *A.*2d 578 (1993) (citing *Skinner v. Railway Labor Executives' Ass'n*, 489 *U.S.* 602, 617, 109 *S.Ct.* 1402, 1413, 103 *L.Ed.*2d 639, 660 (1989); *National Treasury Employees Union v. Von Raab*, 489 *U.S.* 656, 665, 109 *S.Ct.* 1384, 1390, 103 *L.Ed.*2d 685, 701 (1989)). Consequently, the test must meet the reasonableness requirement of the Fourth Amendment, *National Treasury Employees Union v. Von Raab*, 489 *U.S.* 656, 665, 109 *S.Ct.* 1384, 1390, 103 *L.Ed.*2d 685, 701–02 (1989), which " 'depends on all the circumstances surrounding the search or seizure [drug test],' " *Skinner v. Railway Labor Executives' Ass'n*, 489 *U.S.* 602, 619, 109 *S.Ct.* 1402, 1414, 103 *L.Ed.*2d 639, 661 (1989) (quoting *United States v. Montoya de Hernandez*, 473 *U.S.* 531, 537, 105 *S.Ct.* 3304, 3308, 87 *L.Ed.*2d 381, 388 (1985)).

Generally, searches must be based on a warrant supported by probable cause. In exceptional circumstances, a search may be valid in the absence of a warrant, probable cause, or even reasonable individualized suspicion. *Von Raab, supra*, 489 *U.S.* at 665, 109 *S.Ct.* at 1390, 103 *L.Ed.*2d at 702; *Skinner, supra*, 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661. Specifically, when the search "serves special governmental needs, beyond the normal

need for law enforcement," a court must balance the privacy expectations of the individual against the interests of the government "to determine whether it is impractical to require a warrant or some level of individualized suspicion. . . ." *Von Raab, supra,* 489 *U.S.* at 665–66, 109 *S.Ct.* at 1390, 103 *L.Ed.*2d at 702; *accord Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661 (citing *Griffin v. Wisconsin,* 483 *U.S.* 868, 873, 107 *S.Ct.* 3164, 3167, 97 *L.Ed.*2d 709, 717 (1987)).

■ The challenged order, which is designed to deter drug use by police officers and identify officers who are using drugs, serves "special governmental needs." It follows that the department had a compelling interest in testing plaintiff after his arrest. The threat to public safety of a police officer acting under the influence of drugs is "manifest." *National Fed'n of Fed. Employees v. Cheney,* 884 *F.*2d 603, 612 (D.C.Cir.1989), *cert. denied,* 493 *U.S.* 1056, 110 *S.Ct.* 864, 107 *L.Ed.*2d 948 (1990). An officer's authorization to carry firearms, see *N.J.S.A.* 2C:39–6a(7), and the unpredictable demands of his or her job make the daily routine " 'fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.' " *American Fed'n of Gov't Employees, Local 1533 v. Cheney,* 754 *F.Supp.* 1409, 1423 (N.D.Cal.1990) (quoting *Von Raab, supra,* 489 *U.S.* at 670, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 705), *aff'd,* 944 *F.*2d 503 (9th Cir.1991). Every police officer understands that an officer who uses or sells drugs is a threat to the public.

■ Drug testing serves to deter the use of illegal drugs by law-enforcement officials. As a police officer, plaintiff had a diminished expectation of privacy. The department entrusted him to carry firearms, drive emergency vehicles, and "exercis[e] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them." *Policemen's Benevolent Ass'n of N.J. v. Township of Washington,* 850 *F.*2d 133, 141 (3d Cir. 1988). He was in a "safety-sensitive" position, see *Ford v. Dowd,* 931 *F.*2d 1286, 1290 (8th Cir.1991) (stating that police officer is in

"safety-sensitive" position because he carries firearms and drives emergency vehicles), and should have expected an effective inquiry into his fitness and probity. Such an inquiry may include a urinalysis to detect the use of illegal drugs. See *Von Raab, supra,* 489 *U.S.* at 672, 109 *S.Ct.* at 1394, 103 *L.Ed.*2d at 706 (stating that government employees who carry firearms reasonably should expect effective inquiry into their fitness). In the balance of the interests of the department against those of plaintiff, the department's interest in ordering the drug test significantly outweighed plaintiff's privacy interest in freedom from testing. We therefore find appropriate an exception to the warrant and probable-cause requirements.

In *Von Raab, supra,* and *Skinner, supra,* the United States Supreme Court likewise balanced the interests of government employees in certain safety-sensitive positions against the interests of the government in conducting drug testing. The Court relaxed Fourth Amendment protection to the point where individualized suspicion was not required. *Ford, supra,* 931 *F.*2d at 1290 (citing *Von Raab, supra,* 489 *U.S.* at 668–70, 109 *S.Ct.* at 1392, 103 *L.Ed.*2d at 704; *Skinner, supra,* 489 *U.S.* at 632–34, 109 *S.Ct.* at 1421–22, 103 *L.Ed.*2d at 670). It repeated that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." *Skinner, supra,* 489 *U.S.* at 624, 109 *S.Ct.* at 1417, 103 *L.Ed.*2d at 664 (citing *United States v. Martinez–Fuerte,* 428 *U.S.* 543, 561, 96 *S.Ct.* 3074, 3084, 49 *L.Ed.*2d 1116, 1130 (1976)). To justify the directive that a police officer provide a urine sample for a drug test, the Fourth Amendment requires only reasonable suspicion, not probable cause.

We need not decide whether drug testing without individualized suspicion would contravene plaintiff's Fourth Amendment protections. The order explicitly required that "individualized reasonable suspicion" must exist that an officer "ha[s] been unlawfully using drugs."

Individualized reasonable suspicion effectively balances the Fourth Amendment rights of the officer and the interests of the police department in conducting a drug test. *Ford, supra,* 931 *F.*2d at 1291–92; *Fraternal Order of Police, Lodge No. 5 v. Tucker,* 868 *F.*2d 74, 77 (3d Cir.1989) (citing *Copeland v. Philadelphia Police Dep't,* 840 *F.*2d 1139, 1143 (3d Cir.1988)). The purpose of requiring a warrant or reasonable suspicion "is to prevent random or arbitrary intrusions by government agents." *Jackson v. Gates,* 975 *F.*2d 648, 652 (9th Cir.1992) (citing *Skinner, supra,* 489 *U.S.* at 621–22, 109 *S.Ct.* at 1415, 103 *L.Ed.*2d at 663). "[T]he Government's interest in dispensing with the warrant requirement is at its strongest when, as here, 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" *Skinner, supra,* 489 *U.S.* at 623, 109 *S.Ct.* at 1416, 103 *L.Ed.*2d at 663 (quoting *Camara v. Municipal Court,* 387 *U.S.* 523, 533, 87 *S.Ct.* 1727, 1733, 18 *L.Ed.*2d 930, 938 (1967)). As the United States Supreme Court has noted, *ibid.,* traces of illegal drugs are continuously eliminated from the bloodstream. The delay in obtaining a warrant could result in the disappearance of the evidence of drug use. In addition, the probable-cause standard itself can, in some circumstances, "be unhelpful in analyzing the reasonableness of routine administrative functions, especially where the Government seeks to *prevent* the development of hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person." *Von Raab, supra,* 489 *U.S.* at 668, 109 *S.Ct.* at 1392, 103 *L.Ed.*2d at 703 (citations omitted). Probable cause is appropriate in criminal cases, in which the State seeks to deprive defendants of their life or liberty. The less-stringent individualized-reasonable-suspicion standard is more appropriate in a departmental disciplinary proceeding. As serious as is dismissal from public employment, the result is less drastic than the deprivation of life or liberty.

The challenged order contemplates neither random drug testing, see *Guiney v. Roache,* 873 *F.*2d 1557 (1st Cir.) (finding no Fourth Amendment violation from police department rule requiring suspicionless random drug testing of all officers who carry

firearms or participate in drug interdiction), *cert. denied,* 493 *U.S.* 963, 110 *S.Ct.* 404, 107 *L.Ed.*2d 370 (1989), nor a program in which testing is triggered by an accident, *Tanks v. Greater Cleveland Regional Transit Auth.,* 930 *F.*2d 475, 476–77 (6th Cir.1991) (finding program listed eight types of accidents that would trigger drug testing for bus drivers and rail operators). Rather, the order confines testing to situations in which a police officer is suspected of using illegal drugs.

We conclude that the individualized-reasonable-suspicion standard sufficiently restricts the discretion of police supervisors to protect officers against arbitrary and discriminatory testing. *Jackson, supra,* 975 *F.*2d at 652–53; *Ford, supra,* 931 *F.*2d at 1291; *Fraternal Order of Police, Lodge No. 5, supra,* 868 *F.*2d at 77; *Copeland, supra,* 840 *F.*2d at 1143–44. That conclusion is consistent with the Attorney General's *Law Enforcement Drug Screening Guidelines* (1986), which recommend that law-enforcement departments adopt programs that permit drug testing on the basis of individualized reasonable suspicion. In sum, we conclude that individualized reasonable suspicion satisfies the requirements of the Fourth Amendment.

■ Sufficient credible evidence supports the Board's findings, which were based on the ALJ's report, that "Inspector John McAuley approved the drug testing for police officer Willie Rawlings based on an individualized reasonable suspicion believing that he had been unlawfully using drugs." See *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980) ("Ordinarily, an appellate court will reverse the decision of an administrative agency only if it is arbitrary, capricious, or unreasonable or it is not supported by substantial credible evidence in the record as a whole."). Three members of the Narcotics Squad observed plaintiff participating in a suspected drug transaction. They discovered vials of cocaine on the floor on the passenger side of plaintiff's car and on the adjacent sidewalk. An empty vial was at plaintiff's feet on the driver's side. Plaintiff was the only participant with cash. The department reasonably could have concluded that

plaintiff had used drugs. In light of the facts, the department might have been derelict if it had not directed plaintiff to submit to a drug test as required by the standing departmental disciplinary order. Like the Appellate Division, we find no basis for disturbing the Board's finding of individualized reasonable suspicion.

The Fourth Amendment does not compel the exclusion from a departmental disciplinary proceeding of evidence that an officer refused to submit to a drug test that the department requested on individualized reasonable suspicion that the officer had used illegal drugs. Nor does the officer necessarily acquire any greater rights in the disciplinary proceeding merely because he or she was arrested and indicted for related criminal offenses.

For several reasons, we need not reach the issue whether the results of a drug test are admissible in a related criminal proceeding. First, because plaintiff refused to provide a urine sample, no such results are available. Second, this is not a criminal proceeding. Finally, we agree with the Appellate Division's conclusion that "the record in this case does not warrant the conclusion that [plaintiff] declined to give the urine specimen ... because of fear that the urine specimen might, in any way, tend to incriminate him in a criminal proceeding."

The dissent reaches the contrary conclusion, that plaintiff's arrest insulated him from evidence of his refusal in the disciplinary proceeding. According to the dissent, the department must choose between prosecuting or disciplining a police officer unless it grants the officer immunity from the use of drug-test results in a criminal proceeding. *Post* at 199, 627 *A.2d* at 610. Whatever merit lies in that conclusion, we believe that it is not constitutionally compelled. That belief, however, need not foreclose the Legislature from granting immunity, if it finds that such a grant is in the public interest. See *O'Keefe, supra,* 132 *N.J.* at 245, 624 *A.2d* 578 (recommending that the Legislature adopt drug-testing guidelines for public employees and job applicants); *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 107, 609 *A.2d* 11 (1992)

(suggesting that Legislature can best address complex issues of drug testing of private employees).

–III–

■ Plaintiff next claims that the department's direction to provide a urine sample violated his Fifth Amendment right against self-incrimination. He argues that because the department directed him to provide the sample after his arrest, he could not comply without incriminating himself in the proceeding. We disagree.

■ The privilege against self-incrimination protects an accused from testifying against himself or herself, *Schmerber v. California*, 384 *U.S.* 757, 761, 86 *S.Ct.* 1826, 1830, 16 *L.Ed.*2d 908, 914 (1966), not from providing bodily fluids such as urine samples for chemical analysis, *Egloff v. New Jersey Air Nat'l Guard*, 684 *F.Supp.* 1275, 1282 (D.N.J.1988). Consequently, certain non-testimonial examinations are not protected by the privilege against self-incrimination. See *State v. King*, 44 *N.J.* 346, 357, 209 *A.*2d 110 (1965) (stating that "drunkometer" tests and blood tests, among other types of examinations, are non-testimonial and not covered by Fifth Amendment protections). As we recently stated, "the State may force a suspect to submit to a chemical test of bodily substances to determine the amount of alcohol in his blood." *State v. Stever*, 107 *N.J.* 543, 558, 527 *A.*2d 408 (1987) (citing *State v. Macuk*, 57 *N.J.* 1, 14, 268 *A.*2d 1 (1970)). For purposes of Fifth Amendment analysis, we perceive no difference between testing blood or breath for alcohol and testing urine for illegal drugs. The United States Supreme Court has written, "[n]ot even a shadow of testimonial compulsion or enforced communication by the accused [is] involved in the collection upon or in the chemical analysis" of blood for alcoholic content. *Schmerber, supra,* 384 *U.S.* at 765, 86 *S.Ct.* at 1832, 16 *L.Ed.*2d at 916. Similarly, we find no testimonial compulsion in the collection and analysis of urine for illegal drugs. In brief, Harrison's direction to provide a urine sample did not violate plaintiff's privilege against self-incrimination because it did not require plaintiff to testify against himself. We thus conclude that plaintiff did not have the right to refuse to

submit to the drug-testing order under his Fifth Amendment right against self-incrimination.

Plaintiff asserts further that he refused to provide a urine sample because he was confused by a perceived inconsistency between the *Miranda* warnings and the direction to take the drug test. The alleged confusion arose from Harrison's advice that he need not say anything because any statement might be used against him. That advice, plaintiff alleges, was inconsistent with his belief that the drug-test results would be used in the criminal proceeding. We agree, however, with the Appellate Division, which affirmed the agency's finding, that plaintiff did not establish that he had been confused.

Although plaintiff testified that he was confused because of the inconsistency between the *Miranda* warnings and the direction to take the test, he also testified that he had never received any such direction. The ALJ rejected that testimony, finding that Harrison had twice directed him to take the test. In another context, the "confusion" doctrine might provide a narrow exception to the rule requiring a police officer to provide a urine sample. *State v. Leavitt*, 107 *N.J.* 534, 542, 527 *A.*2d 403 (1987); *State v. Sherwin*, 236 *N.J.Super.* 510, 517, 566 *A.*2d 536 (App.Div.1989). Here, plaintiff has not carried his burden of persuasion that confusion over the privilege against self-incrimination led him to refuse to provide a urine sample for a drug test. *Leavitt, supra,* 107 *N.J.* at 542, 527 *A.*2d 403. The record more readily supports the conclusion that plaintiff refused to submit the sample not because he was confused, but because he was afraid he would fail the test.

–IV–

We likewise reject plaintiff's argument that the attorney-client privilege prevented disclosure of his conversation with his union representative. In brief, the privilege does not apply because the union representative was not a lawyer.

The attorney-client privilege, as adopted by the Legislature and this Court, states:

(1) General rule.... communications between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (a) to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it....

\* \* \* \* \* \* \* \*

(3) Definitions. As used in this rule (a) "client" means a person ... [who] directly or through an authorized representative, consults a lawyer or the lawyer's representative for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity ... (b) "lawyer" means a person authorized, or reasonably believed by the client to be authorized to practice law in any State or nation the law of which recognizes a privilege against disclosure of confidential communications between client and lawyer.

[*N.J.S.A.* 2A:84A–20; *Evid.R.* 26.]

As the statute and the Rule plainly state, the privilege covers only communications between a client and a lawyer, *Fellerman v. Bradley,* 99 *N.J.* 493, 499, 493 *A.*2d 1239 (1985), and the client's communications made through " 'necessary intermediaries and agents,' " *State v. Davis,* 116 *N.J.* 341, 361, 561 *A.*2d 1082 (1989) (quoting *State v. Kociolek,* 23 *N.J.* 400, 413, 129 *A.*2d 417 (1957)).

Thus, in *L.J. v. J.B.,* 150 *N.J.Super.* 373, 375 *A.*2d 1202, *certif. denied sub nom. Jacobson v. Balle,* 75 *N.J.* 24, 379 *A.*2d 255 (1977), the Appellate Division rejected the claim that the testimony of a case-work supervisor for a county welfare board should be protected by the lawyer-client privilege. *Id.* at 378, 375 *A.*2d 1202. During a trial arising from the plaintiff's suit for support of a child born out of wedlock, the supervisor testified that the plaintiff had admitted to him that she had on only one occasion engaged in sexual intercourse with the defendant. *Id.* at 376, 375 *A.*2d 1202. The defense used this admission to impeach the plaintiff's testimony that the parties had engaged in intercourse on numerous occasions.

Rejecting the claim of privilege, the Appellate Division found that the plaintiff had not consulted the supervisor "as an agent of an already retained attorney or with the purpose of retaining his principal, an attorney." *Id.* at 378, 375 *A.*2d 1202; *see also State v. Pavin,* 202 *N.J.Super.* 255, 262, 494 *A.*2d 834 (App.Div.1985) (stating that lawyer-client privilege applies only to those communi-

cations between insured and insurance adjuster made for dominant purpose of defense of insured by insured's lawyer); *United Jersey Bank v. Wolosoff*, 196 *N.J.Super.* 553, 563, 483 *A.*2d 821 (App.Div.1984) (remanding issue of lawyer-client privilege because fact that lawyer's duties as in-house counsel may have included responsibilities pertaining to pending litigation not enough, by itself, to compel application of privilege).

Reo's position is analogous to the case-work supervisor in *L.J.* Whatever else Reo may have been, he was not a lawyer or a lawyer's agent. The attorney-client privilege, therefore, did not apply to plaintiff's statements to him.

Moreover, plaintiff did not communicate with Reo in the belief that the union representative was an agent for the lawyer who would handle his case. In fact, when Reo asked plaintiff if he wanted the union representative to call an attorney, he responded that he had an attorney whom he would call the following morning.

–V–

Finally, we find that in light of all the circumstances, dismissal is fairly proportionate to plaintiff's offense. *In re Polk License Revocation*, 90 *N.J.* 550, 578, 449 *A.*2d 7 (1982). Dismissal is appropriate for a police officer who refuses to submit to a drug test when his or her supervisor has reasonable suspicion to believe that he or she has used illegal drugs. *In re Phillips*, 117 *N.J.* 567, 576, 569 *A.*2d 807 (1990) ("The obligation to act in a responsible manner is especially compelling in a case involving a law enforcement official."). Both the order and the Attorney General's *Law Enforcement Drug Screening Guidelines*, which the order incorporates by reference, provide that dismissal is the penalty for a police officer's refusal to submit to a drug test. Courts in other states likewise have sustained dismissals in similar circumstances. *See, e.g., Kinter v. Board of Fire & Police Comm'rs*, 194 *Ill.App.*3d 126, 141 *Ill.Dec.* 80, 84, 550 *N.E.*2d 1126, 1130 (1990) (stating that police officer's refusal to abide by order given by superior that he submit to drug test constituted insubordination that warranted dismissal); *Gaul v. Ward*, 159 *A.D.*2d 380,

553 *N.Y.S.*2d 9, 10 (1990) (stating that dismissal of police officer based on refusal to submit to urinalysis-drug test based on reasonable suspicion not so disproportionate as to shock one's sense of fairness). We thus conclude that dismissal is an appropriate sanction for plaintiff's insubordination.

To summarize, the department had individualized reasonable suspicion that plaintiff had used illegal drugs. Based on that suspicion and on the order, it directed plaintiff to submit to a drug test. Plaintiff's refusal was not justified by reliance on his rights under the Fourth or Fifth Amendments to the federal Constitution. His conduct constituted insubordination and justified his dismissal from the department.

The judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

I agree with the majority that public employees in safety-sensitive positions may be subjected to drug testing on the basis of an individualized reasonable suspicion that the employee may have ingested or may be under the influence of drugs. That doctrine reflects a reasonable balance of the public's interest in safety and the individual's interest in the personal freedom to be free from bodily intrusions. I disagree that when the employer is a law-enforcement agency, it may invoke its rights as an employer to obtain evidence for a criminal prosecution that would otherwise be inadmissible because obtained in violation of the employee's Fourth Amendment rights.

I

The majority mischaracterizes this case as one involving only a departmental disciplinary proceeding when in fact it also involves urine testing in the criminal context. The Jersey City Police Department had Rawlings locked up on criminal charges when it invoked its administrative procedures to force Officer Rawlings to provide a urine sample, which could have provided evidence in support of the criminal charges. Without an offer of immunity

ensuring that the test results would not be used in a criminal trial, the drug testing procedures are flawed for employment purposes. A criminal defendant who is also subject to disciplinary proceedings should not be required to choose between submitting without probable cause to the test that may provide evidence in a criminal trial or refusing to submit to the test under penalty of dismissal from employment.

"A drug test, whether administered by the government either for law-enforcement or employment purposes, is subject to the [search and seizure] requirements of the Fourth Amendment." *O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 242, 624 *A.*2d 578 (1993). A search and seizure is ordinarily unreasonable unless a warrant is issued based on probable cause. *State v. Marshall*, 123 *N.J.* 1, 67, 586 *A.*2d 85 (1991). The New Jersey Constitution sometimes " 'affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment.' " *State v. Hempele*, 120 *N.J.* 182, 195, 576 *A.*2d 793 (1990) (quoting *State v. Novembrino*, 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987)). In this case the Court misperceives the two functions of government involved here. In one capacity the search is valid, in another it is not. As the Court noted in *Hempele:* "The constitutional prohibition on unreasonable government searches " 'does not disappear merely because the government has the right to make reasonable intrusions in *its capacity as employer.*' " " *Id.,* 120 *N.J.* at 205, 576 *A.*2d 793 (quoting *O'Connor v. Ortega*, 480 *U.S.* 709, 717, 107 *S.Ct.* 1492, 1497, 94 *L.Ed.*2d 714, 723 (1987) (quoting *Ortega, supra,* 480 *U.S.* at 731, 107 *S.Ct.* at 1505, 94 *L.Ed.*2d at 732 (Scalia, J., concurring in the judgment))) (emphasis supplied).

In *Hempele* the Court determined that a warrant based on probable cause is required to search garbage for evidence of crime. The Court rejected the argument that the "garbage regulations reduce the level of cause necessary for a search," 120 *N.J.* at 219, 576 *A.*2d 793, because the search was designed to enforce "the drug laws, not [the] garbage regulations." *Ibid.* The analogy is comparable. The police department's urine test is

designed to enforce personnel laws and protect the safety and welfare of the public, not to enforce the criminal drug laws. Although an individualized reasonable-suspicion standard allows the police department to test an officer for disciplinary reasons, the department cannot use the disciplinary regulations to enforce the criminal drug laws without probable cause.

"[T]he probable cause standard " 'is peculiarly related to criminal investigations.' " " *S.S. v. E.S.*, 243 *N.J.Super.* 1, 11–12, 578 *A.*2d 381 (App.Div.1990) (quoting *Colorado v. Bertine*, 479 *U.S.* 367, 371, 107 *S.Ct.* 738, 741, 93 *L.Ed.*2d 739, 745 (1987) (quoting *South Dakota v. Opperman*, 428 *U.S.* 364, 370 n. 5, 96 *S.Ct.* 3092, 3097 n. 5, 49 *L.Ed.*2d 1000, 1006 n. 5 (1976))), *aff'd*, 124 *N.J.* 391, 590 *A.*2d 1188 (1991). The majority also acknowledges that "[p]robable cause is appropriate in criminal cases, in which the State seeks to deprive defendants of their life or liberty." *Ante* at 191, 627 *A.*2d at 606. In analyzing a court-ordered blood test to determine parentage the *S.S. v. E.S.* court distinguished probable cause in the criminal context from reasonable individualized suspicion in the civil context. 243 *N.J.Super.* at 12, 578 *A.*2d 381; *see also Allen v. County of Passaic*, 219 *N.J.Super.* 352, 373, 530 *A.*2d 371 (Law Div.1986) (stating that "[w]hether the urinalysis is conducted as part of a criminal investigation or for some other reason such as employment is a very significant factor of consideration"). In *Skinner v. Railway Labor Executives' Association*, 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989), the Court allowed drug tests of safety-sensitive railroad employees without a warrant or reasonable suspicion. The Court noted that the drug tests were facially designed for administrative purposes. The Court stated: "We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the FRA's program." *Id.* at 621 n. 5, 109 *S.Ct.* at 1415 n. 5, 103 *L.Ed.*2d at 662 n. 5.

In *National Treasury Employees Union v. Von Raab*, 489 *U.S.* 656, 666, 109 *S.Ct.* 1384, 1390, 103 *L.Ed.*2d 685, 702 (1989), the

Court established a relaxed standard for a warrantless search without probable cause when the "[t]est results may not be used in a criminal prosecution." As in *Skinner*, the *Von Raab* Court emphasized that the "drug-testing program is not designed to serve the ordinary needs of law enforcement." *Ibid.* The only way the test results could be used in criminal prosecution was with the employee's permission. *Ibid.*

The history of the federal drug-testing program was recently described by one Court:

> [On] September 15, 1986, President Reagan signed Executive Order No. 12,564, "Drug–Free Federal Workplace," 3 C.F.R. 224 (1987), directing all agency heads to develop programs to test "for the use of illegal drugs by employees in sensitive positions," *id.* at 226, and condemning the use of illegal drugs "on or off duty." *Id.* at 225. The President stated that drug testing "shall not be conducted pursuant to this Order for the purpose of gathering evidence for use in criminal proceedings." *Id.* at 228. He added: "Agencies are not *required* to report to the Attorney General for investigation or prosecution any information, allegation, or evidence relating to violations of Title 21 of the United States Code received as a result of the operation of drug testing programs established pursuant to this Order." *Id.* (emphasis added.)
>
> [*National Fed'n of Fed. Employees v. Carlucci*, 680 *F.Supp.* 416, 421 (D.D.C. 1988).]

"Congress limited the use that can be made of drug test results. For example, no disclosure to law enforcement officials is permitted without the employee's consent." *Id.* at 421 n. 7 (citing Supplemental Appropriations Act of 1987, Pub.L. No. 100–71, § 503(e), 101 Stat. 391, 471 (1987)). Thus, "drug testing must serve some 'special needs' of the employing governmental body, rather than being designed to gather evidence for a criminal prosecution." *International Fed'n of Professional & Technical Eng'rs, Local 194A v. Burlington County Bridge Comm'n*, 240 *N.J.Super.* 9, 22, 572 *A*.2d 204 (App.Div.), *certif. denied,* 122 *N.J.* 183, 584 *A*.2d 244 (1990). In fact, the assurance that the drug-test results will not apply in criminal proceedings is an important factor in upholding warrantless drug testing with less than probable cause. *See, e.g., International Bhd. of Teamsters v. Dep't of Transp.*, 932 *F*.2d 1292, 1299 (9th Cir.1991) (noting regulations "preclude the tests' use for law enforcement purposes by protecting the confidentiality of test results"); *Burka v. New York City*

*Transit Auth.,* 739 *F.Supp.* 814, 828 (S.D.N.Y.1990) (noting that probable-cause standard governs criminal investigations and that enforcement of criminal code is not goal of drug-testing program); *Amalgamated Transit Union, Local 993 v. City of Oklahoma City,* 710 *F.Supp.* 1321, 1332 (W.D.Okl.1988) (highlighting that drug-test results "would not lead to criminal charges").

In exigent circumstances a warrantless search when based on probable cause is constitutional. *See, e.g., Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966) (authorizing blood test for alcohol after accident when police officer smelled liquor, and subject's eyes bloodshot and glassy); *State v. Dyal,* 97 *N.J.* 229, 239, 478 *A.*2d 390 (1984) (authorizing blood test for "apparently intoxicated automobile operator"); *State v. Malik,* 221 *N.J.Super.* 114, 534 *A.*2d 27 (App.Div.1987) (allowing warrantless extraction of urine sample when open can of beer, green vegetation, yellow pills, rolling paper, "coke spoon," and pipe found in car and defendant had "watery" and "bloodshot" eyes, slurred speech, and was belligerent). *But see United States v. Pond,* 36 *M.J.* 1050, 1058–59 (AFCMR 1993) (finding no exigent circumstances when methamphetamine use can be detected by a urine test "some 24 to 48 hours after consumption of the drug"). The supervising officer who requested that Rawlings submit to a drug test, testified that Officer Rawlings "was not obviously under the influence of cocaine" and lacked the normal signs associated with drug use such as general nervousness, rapid hand movements, rapid speech, and twitching. Therefore, no probable cause existed justifying the drug test. In addition, unlike with alcohol, no exigent circumstance exists to justify a warrantless search for cocaine because cocaine can be detected in urine from two to five days. *See* Kurt M. Dubowski, *Drug–Use Testing: Scientific Perspectives,* 11 *Nova L.Rev.* 415, 530 (1987) (containing table of "Typical Duration of Drug Detectability in Urine After Last Use" of several drugs); *cf. United States v. Miller,* 34 *M.J.* 598, 600 (ACMR 1992) (discussing study published in toxicology journal indicating detectability of cocaine for at least forty-eight hours after ingestion); *Green v. State,* 260 Ga. 625, 398 *S.E.*2d 360, 361 (1990) (discussing "testimo-

ny of a certified urinalysis field technician that cocaine metabolites are detectable in an individual's urine 2–4 days after the individual ingests cocaine"), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 2059, 114 *L.Ed.*2d 464 (1991).

Rawlings was given an unacceptable choice: he could either take the drug test and if positive have the result used in both a criminal and administrative proceeding, or refuse to take the test and face dismissal for failing to obey a direct order. Even the implied consent statute in *South Dakota v. Neville,* 459 *U.S.* 553, 103 *S.Ct.* 916, 74 *L.Ed.*2d 748 (1983), requires a careful explanation to the accused. In *Pond, supra,* 36 *M.J.* 1050, the government argued that a urine test administered to a driver is admissible under California's implied consent statute. However, the court determined that the test was not valid under the implied consent statute because the police officer did not provide Pond with any of the "advice the statute required concerning the consequences of refusing to consent." *Id.* at 1057. As expressed in President Reagan's Executive Order No. 12,564, results of an employee-drug-testing program should not be used in criminal proceedings. A valid drug-testing program would have assured Rawlings that the drug-test results would not be used in a criminal proceeding. Without immunity and probable cause the police department's desire to conduct a warrantless search for evidence of crime based on individual reasonable suspicion is unconstitutional.

In *Skinner* the Court specifically left open the question of whether a drug-testing program based on a warrantless search without probable cause would be unconstitutional if the results were used in a criminal proceeding. No State or federal case in this jurisdiction has upheld an administrative drug-testing program that automatically results in criminal prosecution. Rawlings' refusal to submit to a drug test without probable cause when the results would be used in a criminal proceeding constitutes nothing more than an assertion of a constitutional right. A police-drug testing program, justified by safety concerns and designed for administrative purposes, may not be used to force a person to

submit to a warrantless drug test for criminal evidence absent probable·cause.

In *Banca v. Phillipsburg,* 181 *N.J.Super.* 109, 436 *A.*2d 944 (App.Div.1981), the court addressed whether a police officer can be disciplined for failing to cooperate in a criminal investigation if the officer is the target of the investigation and has not been offered use immunity. The court recognized

> that when a public employee makes a self-incriminatory statement in response to a threat of discharge, that statement must necessarily be regarded as coerced and, therefore, as secured in violation of the employee's constitutional privilege not to incriminate himself. If, however, he is protected from the normal consequences of a self-incriminatory statement, that is, if the statement may not be used against him in a subsequent criminal proceeding, then the choice he must make between loss of his employment and the giving of the statement, however much a Hobson's choice it may be, does not offend his constitutional privilege. The offer, therefore, of use immunity when the statement is solicited is constitutionally prerequisite to the imposition of the disciplinary sanction for failing to give it.

[*Id.* at 113, 436 *A.*2d 944.]

*See also Garrity v. New Jersey,* 385 *U.S.* 493, 509, 87 *S.Ct.* 616, 620, 17 *L.Ed.*2d 562, 567 (1967) (holding that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits used [sic] in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic").

In this field "[w]e are on the cutting edge of new law." *Tanks v. Greater Cleveland Regional Transit Auth.,* 739 *F.Supp.* 1113, 1123 (N.D.Ohio 1990), *aff'd,* 930 *F.*2d 475 (6th Cir.1991). Police officers, although surrendering some expectations of privacy, do not surrender their constitutional rights. Taking bodily fluids from a person may not violate the Fifth Amendment but it does violate the Fourth Amendment if it is unreasonable. I find the Fifth Amendment use-immunity analysis equally persuasive in the Fourth Amendment context. Drug testing is a new form of compulsory evidence-gathering.

> "There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a

function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom."

[*Skinner, supra,* 489 *U.S.* at 617, 109 *S.Ct.* at 1413, 103 *L.Ed.*2d at 660 (quoting *National Treasury Employees Union v. Von Raab,* 816 *F.*2d 170, 175 (1987).]

Validation of governmental intrusions into the dignity and privacy of public employees deserves the considered analysis of this Court rather than the avoidance of the issue, as the majority does. *Ante* at 193–194, 627 *A.*2d at 607–608. We have never decided what is a valid drug-testing program. *See, In re Carberry,* 114 *N.J.* 574, 556 *A.*2d 314 (1989) (remanding to Superintendent of Division of State Police constitutional challenge to drug-testing program). Before discharging Officer Rawlings the Court should decide whether the police department's drug-testing program met all constitutional requirements. I do not believe that the program met those requirements. Officer Rawlings should have known whether the results of the test could be used in both the administrative and the criminal proceedings. As in *Banca* and *Garrity,* no public employee, even a police officer, should have to choose between losing a job or submitting to an unconstitutional action. Therefore, I respectfully dissent.

Justice STEIN joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal*—Justices O'HERN and STEIN–2.