**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3043-16T2

R.K.,

    Plaintiff-Respondent,

v.

P.M.,

    Defendant-Appellant.

_____

Argued May 30, 2018 — Decided June 25, 2018

Before Judges Moynihan and Natali.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Bergen County,
Docket No. FV-02-0932-17.

Elton John Bozanian argued the cause for
appellant (Rotolo, Bozanian & Yi, LLC,
attorneys; Elton John Bozanian, on the brief).

Michael J. Evans argued the cause for
respondent (Weinberger Divorce & Family Law
Group, LLC, attorneys; Michael J. Evans, on
the brief).

PER CURIAM

Defendant P.M. appeals from a final restraining order (FRO)
entered in favor of plaintiff R.K., pursuant to the Prevention of
Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (the Act).  We affirm.

Plaintiff and defendant are married and have one child, a son, J.M. At the time plaintiff obtained her temporary restraining order (TRO), the parties were involved in a pending divorce action in Pennsylvania and simultaneously embroiled in a contested custody dispute in New Jersey that resulted in plaintiff being awarded legal custody of J.M. with defendant exercising parenting time. Judge James X. Sattely, Jr., presided over the parties' custody dispute and plaintiff's application for an FRO.

In her complaint in support of the TRO, plaintiff recounted escalating acts of harassment. She alleged that on October 26, 2016, defendant dropped off J.M., argued with plaintiff and yelled at J.M. to call 911 to report that she was hurting the child. Plaintiff further alleged that defendant contacted J.M.'s daycare center to inquire if plaintiff was neglecting him. Plaintiff also claimed that defendant called her employer with the purpose of getting her fired. She expressed particular distress with respect to that call because she is a non-resident working pursuant to an H-1B visa and feared that if she was fired, she would get deported and lose custody of J.M.

Plaintiff also alleged defendant had committed a prior act of domestic violence during the marriage four years earlier. She maintained that defendant assaulted her when she was pregnant by pushing her towards a wall.

A-3043-16T2

Both parties appeared with counsel over the course of four days for the FRO hearing. Judge Sattely heard testimony from plaintiff and defendant, along with plaintiff's employer and workers from J.M.'s daycare center. The trial judge also considered documentary evidence introduced by the parties, including a series of text and email messages, a police report stemming from the October 26 incident, and financial information and pay stubs produced in the custody litigation.

Plaintiff testified consistent with the statement in the TRO that, at the October 26 drop off, defendant falsely instructed J.M. to call 911 to report that plaintiff was hurting him. She also stated that the next day she learned defendant called J.M.'s daycare center and told them that she was "not taking care of the child, . . . [and] not taking the child to the doctor." She testified that, as a result of these communications, she was "alarmed and . . . felt harassed." She stated that she similarly felt "harassed, . . . very alarmed[,] and insecure" when she learned that defendant had contacted her employer and told him plaintiff was not taking proper care of their child. She stressed to the trial judge that, if fired, she will lose her work visa and will be required to leave the United States putting her custody of J.M. at risk. Plaintiff also testified regarding the alleged prior act of domestic violence.

A-3043-16T2

Further, plaintiff testified that defendant emailed her asking whether the misalignment of J.M.'s front teeth resulted from plaintiff or her mother putting "physical pressure" on his teeth and whether she had a plan to address the issue. Plaintiff advised that at the time the email was sent, J.M. visited the dentist and defendant was in possession of J.M.'s dental report and future dental plan.

Defendant also testified. With respect to the October 26 incident, he defended his direction to J.M., a four year old at the time, to call 911 by claiming plaintiff was shouting at the child. He also admitted he called the Division of Child Protection and Permanency the next day because he "wanted them to know how [the child] was yelled at[,] . . . [h]ow he was shouted at and how he was handled." According to defendant, he called and emailed J.M.'s daycare center to inquire about his well-being and behavior and to see if J.M. "was alive." Defendant emphasized that his communications with plaintiff and the daycare center involved only J.M. and his health and well-being.

Defendant further explained that he called plaintiff's employer to "verify that the information that [plaintiff] gave [him], that she [was] not working," was accurate. He testified that he neither asked nor intended for plaintiff's employer to take action against plaintiff. However, on cross-examination, defendant acknowledged that prior to calling plaintiff's employer he was aware of plaintiff's employment status and earnings through the end of October 2016.

A-3043-16T2

Defendant also indicated that he knew that plaintiff was on H-1B visa status. As he had been an H-1B visa employee at one point in time, defendant understood the significance of plaintiff maintaining employment by a sponsoring employer. Defendant denied telling the daycare representative and plaintiff's employer that plaintiff does not take their child to the doctor.

Plaintiff's employer confirmed that he is plaintiff's sponsor for her H-1B work visa. He testified that he received an unsolicited phone call from defendant at around 7:00 a.m. on November 18, 2016. Defendant advised him of the parties' divorce proceedings and stated that he wanted to talk about the inadequate care that plaintiff was providing their child. Plaintiff's employer stated that defendant was soliciting his help on "humanitar[ian] grounds" and asked if he could come to his office to show him supporting documentation. Plaintiff's employer told defendant he did not want to get involved in the parties' personal life but would do whatever he is legally obligated to do. When defendant called plaintiff's employer twice later that day, he purposely did not take the calls.

Plaintiff's employer testified that he informed plaintiff of the phone call and instructed her that he was "not happy" and did not want to get involved in her personal life. Plaintiff's employer confirmed that defendant did not ask him to take any action against plaintiff and that he did not take action against plaintiff as a result of the call.

The daycare representative testified that defendant called her and stated that J.M. had not gone to the doctor very often. Defendant requested that the daycare representative ask J.M. if he was unhappy, but she declined the request and indicated that, while in school, he does not exhibit signs of unhappiness. The daycare representative also testified that she received another phone call from defendant in November 2016. She stated that defendant claimed plaintiff was verbally abusing the child.

In his oral decision, the trial judge found that plaintiff testified in a "straightforward manner" and had a "good recall of the facts" that led to the TRO and the prior act of domestic violence. He characterized her testimony as "persuasive and credible."

Conversely, Judge Sattely stated defendant's testimony "lacked credibility," and was "inconsistent" as to his motivation behind his actions that led to plaintiff filing for a temporary restraining order. He characterized defendant's explanation that he contacted plaintiff's employer only to verify her employment status as "disingenuous." After considering the trial testimony and documentary evidence, Judge Sattely issued detailed factual findings and legal conclusions and found that the plaintiff met her burden of establishing a predicate act of harassment under N.J.S.A. 2C:33-4(c) because defendant "committed a course of alarming conduct of repeatedly commit[ting] acts with the purpose to alarm and seriously annoy the plaintiff." The trial judge found that the alarming conduct

began with the October 26 incident and culminated with defendant's telephone call to plaintiff's employer.

The trial judge outlined defendant's acts of harassment in October and November 2016. In particular, the trial judge found defendant's contact with plaintiff's employer alone "constitutes a form of non-physical domestic violence with an equally harmful purpose." While defendant indicated that he called plaintiff's employer to verify plaintiff's employment, he acknowledged that documents he received in the custody litigation contained plaintiff's financial and employment information. In granting the FRO, the trial judge also held that it was clear that defendant "cannot and will not cease bothering or threatening the plaintiff in light of the pending and ongoing custody and parenting time disputes."

Finally, in his oral decision, the trial judge considered that the parties were engaged in contested custody and parenting time litigation that resulted in the court ordering a best interests evaluation on October 13, 2016. Judge Sattely recognized that,

> while it is possible in a given case that a party has filed a [d]omestic [v]iolence [c]omplaint to gain an advantage in other litigation, it may be equally plausible in a given case that as a . . . direct result of such other litigation defendant improperly committed domestic violence against the plaintiff.
>
> Here, it was . . . the defendant and his course of conduct during the pendency of the custody

and parenting time evaluation that was trying
to obtain an advantage against the plaintiff.

On appeal, defendant argues that the evidence did not support the trial judge's finding of harassment, and that the trial judge made erroneous evidentiary rulings and did not correctly apply the law.

When reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We do not disturb the "factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988). Moreover, substantial deference is given to a Family Part judge's evidentiary rulings.

See State v. Morton, 155 N.J. 383, 453 (1998); Dinter v. Sears, Roebuck & Co., 252 N.J. Super. 84, 92 (App. Div. 1991).

The Act defines domestic violence by referring to a list of predicate offenses found within the New Jersey Criminal Code. J.D. v. M.D.F., 207 N.J. 458, 473 (2011). "[T]he commission of a predicate act, if the plaintiff meets the definition of a 'victim of domestic violence,' N.J.S.A. 2C:25-19(d), constitutes domestic violence." Ibid. Harassment is a predicate offense under the Act. N.J.S.A. 2C:25-19(a)(13).

Before an FRO is entered, the trial court must make specific findings consistent with our opinion in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Next, the court must determine whether a restraining order is required to protect the party seeking restraints from future acts or threats of violence. Id. at 126-27.

Here, the trial judge concluded defendant harassed plaintiff. A person commits the petty disorderly persons offense of harassment if, with purpose to harass another, he or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c).]

For a finding of harassment under N.J.S.A. 2C:33-4, defendant must have had the purpose to harass plaintiff. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995). Finding a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487. "A finding of a purpose to harass may be inferred from the evidence presented." State v. Hoffman, 149 N.J. 564, 577 (1997). "Common sense and experience may inform that determination." Ibid.

Applying these standards, we are satisfied the record supports the trial judge's credibility determinations, factual findings, and legal conclusions. There was credible evidence before the trial court that defendant harassed plaintiff and that the FRO was necessary to protect plaintiff from further acts of abuse.

The trial judge rejected defendant's request to review his communications to plaintiff, the daycare employees and plaintiff's employer in isolation and for the purported legitimate basis that they were made not to alarm or annoy plaintiff but merely to address J.M.'s health and safety. Rather, the trial judge, with the benefit of "see[ing] and observ[ing] the witnesses," see Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961), properly viewed the communications in their appropriate context with the other trial evidence. In this light, we cannot determine that the trial judge abused his discretion when he concluded that defendant's communications were made with the purpose "to alarm or seriously annoy" plaintiff. N.J.S.A. 2C:33-4(c).

In particular, there is sufficient evidence from which to infer that defendant's false statements that plaintiff was harming J.M. and his direction to their child to call 911, his inaccurate comments to an employee of the daycare facility that plaintiff was not taking the child to the doctor and was verbally abusive, and

his completely unnecessary call to plaintiff's employer, were motivated by his intention to harass plaintiff. See C.M.F. v. R.G.F., 418 N.J. Super. 396, 404 (App. Div. 2002).

Defendant also claims that the trial judge erred when he relied on Murray v. Murray, 267 N.J. Super. 406 (App. Div. 1993). We disagree. In Murray, 267 N.J. Super. at 410, we expressed concern about parties in matrimonial litigation improperly employing the Act "to secure rulings on critical issues such as support, exclusion from marital residence and property disposition." Here, the parties were entangled in contested custody litigation and defendant maintained that the TRO was filed in response to Judge Sattely's ordering of a best interest evaluation. Thus, the trial judge correctly took into consideration these facts when rendering his decision.

By factoring into his analysis the custody litigation and defendant's claims, the trial judge adhered to Judge (later Justice) Long's comments that "[t]he domestic violence law was intended to address matters of consequence, not ordinary domestic contretemps," Corrente, 281 N.J. Super. at 250, and that improper use of the Act could have a "secondary negative effect: the potential for unfair advantage to a matrimonial litigant[,]" Peranio v. Peranio, 280 N.J. Super 47, 56 (App. Div. 1995).

In granting the FRO, the trial judge implicitly acknowledged that neither Corrente nor Peranio stands for the proposition that parties in the throes of custody proceedings are free to engage in acts of domestic violence. Just as the Act should not be used as a sword to gain advantage in matrimonial litigation, parties similarly may not use those contested actions as a shield from the application of the Act.

Similarly, we reject defendant's challenge to the FRO based on the trial judge's purported reliance on a trial court decision. First, Judge Sattely did not cite the decision in his oral decision and he noted during the trial proceedings that the decision was not "binding on this [c]ourt." However, to the extent Judge Sattely's oral decision was nevertheless based on the reasoning in that trial court opinion, we find no error. Indeed, Judge Sattely's decision that defendant's contact with plaintiff's employer constituted economic harassment and represented a "non-physical domestic violence with an equally harmful purpose" was amply supported by his factual and credibility findings. The trial judge's comments merely recognized that not every harassing communication must contain coarse language or vituperative epithets for it to "alarm or seriously annoy."

The record also supports the trial judge's conclusion that the second Silver factor was satisfied and an FRO was needed to

protect plaintiff against further abuse. In this regard, the trial judge concluded that defendant's harassing behavior posed a risk to plaintiff's employment. He noted plaintiff's fear regarding her employability due to defendant's conduct. The previous history of domestic violence when defendant shoved the pregnant plaintiff towards a wall was an appropriate factor warranting the entry of an FRO. See N.J.S.A. 2C:25-29(a)(1).

We also disagree that the trial judge's evidentiary rulings warrant reversal. Defendant claims that Judge Sattely improperly excluded evidence regarding J.M.'s medical history that would have informed the judge's consideration regarding defendant's intent and plaintiff's and her brother's business relationship with plaintiff's employer that would have revealed plaintiff's employer's bias.

First, our review of the trial record reveals that Judge Sattely permitted extensive testimony on both points. Indeed, defendant testified regarding his concerns about J.M. because of his prior hospitalization in December 2014, his urinary tract infection, and his need for speech therapy. Defendant also testified regarding a prior business relationship between plaintiff and her employer. On this point, the trial judge stated that it is "[s]tipulated that they had a relationship." When limiting cross-examination of plaintiff's employer on any prior

14

business relationship, the trial judge noted that the subpoena compelling his trial testimony was expressly limited to communications between himself and defendant concerning plaintiff. We give substantial deference to the trial judge's rulings. Morton, 155 N.J. at 453.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).[1]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[1] Defendant's notice of appeal seeks review of only the FRO. In his merits brief, defendant advised that the trial judge later issued an order awarding counsel fees to plaintiff in accordance with N.J.S.A. 2C:25-29(b)(4). Defendant further stated that he "does not specifically" appeal the award of counsel fees and only asks that the award be rendered moot if his appeal is granted. Because we have affirmed the FRO, defendant's argument that the later counsel-fee order would be impacted or groundless if we were to reverse has not ripened. Consequently, we need not consider whether the counsel-fee order is properly before us for review.

A-3043-16T2